# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Liberties Lofts LLC,          :

           Appellant     :

                            :     No. 827 C.D. 2017

           v.                 :     Argued: March 8, 2018

                            :

Zoning Board of Adjustment     :

BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE JAMES GARDNER COLINS, Senior Judge

**OPINION**
**BY JUDGE SIMPSON**                 **FILED: April 2, 2018**

In this zoning appeal, Liberties Lofts LLC (Objector) asks whether the Court of Common Pleas of Philadelphia County[1] (trial court) erred in affirming a decision of the Philadelphia Zoning Board of Adjustment (ZBA) that granted a use variance to Hightop Brown, LLC (Applicant) to permit construction of a 26-unit multi-family residence with one commercial space in an ICMX Industrial Commercial Mixed-Use Zoning District in the City of Philadelphia (City). Despite raising numerous issues, Objector essentially argues that: (1) Applicant lacked standing to seek the requested zoning relief; and, (2) the ZBA erred in granting the variance where Applicant did not satisfy the requisite variance criteria. Upon review, we affirm.

---

[1] The Honorable Daniel J. Anders presided.

# I. Background

The ZBA made the following findings. In April 2016, Applicant, the equitable owner of the property located at 723-729 North Sixth Street (subject property), applied to the Philadelphia Department of Licenses and Inspections (L&I) for a zoning/use registration permit for the proposed construction of a 5-story, 26-unit, multi-family residence with one commercial space, garage parking for 14 cars, and a roof deck and pilot house. L&I determined the proposed use was prohibited in the ICMX zoning district in which the subject property lies pursuant to the Philadelphia Zoning Code (Zoning Code). Thus, L&I issued a notice of refusal. Applicant appealed to the ZBA. A hearing ensued.

The hearing record revealed that the subject property is an 8,762-square foot lot located at the southeast corner of North Sixth and Brown Streets in the City. It is improved with a one-story structure that Applicant's counsel described as a "blighted … former industrial building" that was "mostly vacant for some time." ZBA Op., 11/23/16, Finding of Fact (F.F.) No. 8 (quoting ZBA Hr'g, 6/22/16, Notes of Testimony (N.T.) at 3). The area surrounding the subject property is comprised of a mix of Residential Multi-Family-1 (RM-1), Residential Single-Family Attached-5 (RSA-5), Industrial Residential Mixed-Use (IRMX), and Neighborhood Commercial Mixed-Use-2 (CMX-2) zoning districts. Applicant's counsel described the surrounding area as including a number of residential uses:

> To the north there is a series of single family houses. To our west there is a school. To the east there are multi[-]family houses. And directly to the east is a large 61-unit, multi[-]family building. And to our south is also a couple of multi[-]family properties as well.

F.F. No. 10 (quoting N.T. at 5-6).

2

Applicant's counsel submitted a list identifying 11 multi-family residential uses in the immediate vicinity, including a 61-unit multi-family building located adjacent to the subject property, which was approved by virtue of a use variance granted in 2001.

Applicant's counsel described Applicant's proposal as "a five story building, 26 condo units, 14 parking spaces at the ground floor, as well as a small commercial space on the corner." F.F. No. 12. He indicated that two 700-square foot one-bedroom units would be located on the ground floor and the remaining 24 units—a mix of one and two-bedroom units ranging from 1,000 to 1,300 square feet –would be located on the upper floors. Applicant's counsel described the building as designed "to an IRMX standard" and stated the height of the building is intended to "match the height of the adjacent building." Id. (quoting N.T. at 4, 47).

Applicant's counsel further stated Applicant had numerous meetings with the community prior to appearing before the ZBA, and Applicant revised its proposal in response to community requests for more on-site parking and "activity along North 6th Street." F.F. No. 13 (quoting N.T. at 4).

In support of its variance request, Applicant presented the testimony of project architect Michael Skolnick (Applicant's Architect) regarding the design and use of the proposed building and its compatibility with surrounding uses. Applicant's Architect stated that, in designing the proposed multi-family dwelling, Applicant "looked at adjacent land uses and the adjacent zoning" then "tried to … design this project based on an IRMX use." F.F. No. 16 (quoting N.T. at 5-6). Applicant's

Architect described the proposal as "pretty consistent with everything around us" and stated "we believe that we comply with that IRMX use with the area, the [height], the uses that are in the buildings, as well as our adjacent property." F.F. No. 16 (quoting N.T. at 12). Applicant's Architect estimated the height of the adjacent multi-family building as approximately "55 feet to the roofline." F.F. No. 17 (quoting N.T. at 7).

Applicant also presented the testimony of its corporate representative David Landskroner (Applicant's Representative). Applicant's Representative testified that he "reviewed leases [and] seller documentation[,]" "did an inspection of the [subject] property and … ran financial analyses to make sure that the project made sense from an economic standpoint." F.F. No. 19 (citing N.T. at 8).

Describing the subject property's rental history, Applicant's Representative stated, "the [subject] property consists of four spaces, and there is a long history of vacancy." F.F. No. 20. He then identified the prior uses by space, stating that space A "was a kitchen business that went out of business in 2009," space B was a "grocery store that went out of business in 2014," space C was a "gym and karate space" that was "vacated in January of 2016," and space D was occupied by tenants who chose not to renew their lease when it expired in 2015 and remained at the subject property "on a month-to-month lease" while "looking for a new space." F.F. No. 20 (quoting N.T. at 9). Applicant's Representative noted that the prior tenants in space B "were delinquent in their rent month after month" and the prior tenants of space C "were three to six months in arrears in rent" and in default on

4

their lease when they vacated the property in January 2016. F.F. No. 21 (quoting N.T. at 9).

Applicant's Representative described the existing structure as "a single story, old, dilapidated, outdated warehouse" and the rental spaces as needing "extensive renovations." F.F. No. 22 (quoting N.T. at 8-9). When questioned about the viability of ICMX uses for the subject property, and specifically asked if "after the cost of renovation, of demolition" he could "find a tenant to pay any kind of market rent that would make this project work," Applicant's Representative responded "absolutely not." F.F. No. 23 (quoting N.T. at 10).

Applicant's Representative also submitted documents pertaining to the feasibility of retail, industrial, and residential uses of the subject property using a range of purchase prices, including a purchase price of zero. The results supported his conclusion that retail and industrial uses were not viable, even assuming a zero cost. F.F. No. 25. When asked if there was "any scenario where [he] could utilize the property with an ICMX use and not lose money, [Applicant's Representative] responded 'Absolutely not. The property, as it is zoned currently, is valueless. There's no value.'" F.F. No. 26 (quoting N.T. at 11).

In addition, Applicant presented the testimony of Jacob Cooper, the managing director of MSC Retail, a commercial real estate brokerage firm based in the City (Applicant's Commercial Real Estate Broker), who testified he was familiar with the Northern Liberties neighborhood in which the subject property is located. When asked to describe the type of retail, commercial and industrial uses commonly

5

located there, Applicant's Commercial Real Estate Broker stated: "Depending on the street it's a variety of neighborhood goods and services, food and beverage uses, fitness uses, ground floor offices. As you move more north to Fishtown, there is more entertainment-driven uses. Also specifically along the Delaware Avenue corridor as well." F.F. No. 30 (quoting N.T. at 13).

When asked if there was "a particular area in Northern Liberties where the retail market is stronger," Applicant's Commercial Real Estate Broker replied:

> North Second Street is really the main corridor of retail activity in Norther[n] Liberties. Other prime intersections are Frankford Avenue and Girard Avenue, which [go] into Fishtown. Specifically in Northern Liberties it is the larger streets, so it's Spring Garden, it's North Second Street, largely between Fairmount and Girard, as well as West Girard Avenue to the north of Northern Liberties.

F.F. No. 31 (quoting N.T. at 13).

Further, when asked if there was a strong market for retail use at the corner of Sixth and Brown Streets, Applicant's Commercial Real Estate Broker opined it "is not a viable retail location or one that I would characterize with any significant retail value." F.F. No. 32 (quoting N.T. at 15). Applicant's Commercial Real Estate Broker testified the existing building on the subject property is not, in any case, rentable in its current condition. Applicant's Commercial Real Estate Broker opined the subject property also was not "a viable industrial site ... [l]argely because of the physical nature of the building, the lack of high ceilings, the lack of loading, the lack of parking, as well as the surrounding nature of the building in the neighborhood." F.F. No. 34 (quoting N.T. at 17).

6

In opposition to the requested variance, Howard Silverman, an attorney and the managing member of Liberties Lofts (Objector's Representative), testified regarding Objector's opposition to the proposed development. When questioned by Applicant's counsel, Objector's Representative acknowledged that the building he owns, which is adjacent to the subject property, received variances, and the additional multi-family units proposed for the subject property would create competition for his property, which he identified as a ground for objection. Objector's Representative also expressed concern as to the proposed development's impact on light and air to his property and parking availability, but he did not dispute that the proposed height and parking were permitted by Zoning Code.

Objector's Representative further argued Applicant did not establish hardship and the requested variance was not "the least restrictive." F.F. No. 39. He suggested the "least restrictive" variance would be one that permitted development in accordance with RSA-5 standards. Id. (quoting N.T. at 37-38).

The final witness to testify, Planning Commission representative Paula Burns (Planning Commission Representative), reported that her agency recommended that Applicant be required to dedicate the subject property to an industrial or commercial use, but she did not express opposition to the remainder of the proposed development. In response to Planning Commission Representative's comments, Applicant's counsel again noted that "renting commercial here is difficult" and stated "any additional commercial reduces parking." F.F. No. 41 (quoting N.T. at 46-47). He characterized the proposed first floor mix of parking,

7

commercial and residential as having resulted from "juggling with the community" and responding to the community's "desire for additional parking." Id.

The ZBA also received and considered a letter from Northern Liberties Neighbors Association Zoning Chair Larry Freedman confirming that the registered community organization (RCO) supported the project as reflected in the revised plans presented at the public meeting on the proposal.

At the conclusion of the hearing, the ZBA voted to grant the requested variance, subject to the proposed development's conformance with the revised plans submitted at the hearing.

In its decision, the ZBA made the following relevant conclusions of law. The proposed residential use is not permitted in the ICMX district; thus, it requires a use variance.

To establish entitlement to a variance, an applicant must show: an unnecessary hardship resulting from the property's unique physical conditions or circumstances; that such hardship is not self-imposed; that granting the variance would not adversely affect the public health, safety or welfare; and that the variance, if granted, would represent the minimum necessary to afford relief. Alpine, Inc. v. Abington Twp. Zoning Hearing Bd., 654 A.2d 186 (Pa. Cmwlth. 1995).

Further, the ZBA observed, Pennsylvania courts recognize that changes to the surrounding neighborhood may give rise to unnecessary hardship. Thus, in

8

South of South Street Neighborhood Ass'n v. Philadelphia Zoning Board of Adjustment, 54 A.3d 115, 120 (Pa. Cmwlth. 2012), disapproved of on other grounds by Scott v. City of Philadelphia, Zoning Board of Adjustment, 126 A.3d 938 (Pa. 2015) (Scott 2015), the Commonwealth Court noted, while "a property may once have not been burdened by an unnecessary hardship, the course of time may effect changes to that property and the surrounding area, which may ultimately result in the creation of an unnecessary hardship that did not previously exist."  See also Chosen 300 Ministries, Inc. v. Phila. Zoning Bd. of Adjustment (Pa. Cmwlth., No. 67 C.D. 2015, filed January 19, 2016), slip op. at 9, 2016 WL 224036 at *4 (unreported) (approving ZBA's finding that "it was not only the irregular shape of the lot that formed the basis of the hardship, but also the lack of industrial development in the neighborhood and the transitioning from industrial to commercial that created the hardship.").

The ZBA further noted this Court rejected the argument that an existing passive or minimal use of a property is sufficient to show that no hardship exists. Chosen 300 Ministries.   Indeed, our Supreme Court "explicitly rejected the requirement that an applicant for a variance … eliminate every possible permitted use."  Id. (quoting Marshall v. Phila. Zoning Bd. of Adjustment, 97 A.3d 323, 333 (Pa. 2014)).

Here, the ZBA determined, Applicant established entitlement to the requested variance.  Specifically, the ZBA explained, the existing building on the subject property is a dilapidated warehouse that has been vacant or underused for many years.  Further, the uses surrounding the subject property consist of several multi-family developments, including a 61-unit multi-family building on the

adjacent property to the east. The ZBA further determined Applicant presented evidence, including credible expert testimony, sufficient to establish that uses permitted under existing zoning regulations are not viable, and the requested variance is the minimum necessary to afford relief. The ZBA also noted the partial occupation of the building by tenants (some of whom failed to pay rent in a timely manner in the recent past) did not preclude a finding of hardship.

In addition, the ZBA determined the proposed development would not negatively impact the public health, safety or welfare. The ZBA stated the proposed use will replace a blighted, mostly vacant building with a mixed use structure that conforms to all applicable dimensional standards, is consistent with surrounding structures and uses, and provides more than the required number of on-site parking spaces. Additionally, the proposed use received support from the area's RCO. For these reasons, the ZBA granted the requested variance. Objector appealed to the trial court.

Without taking additional evidence, the trial court affirmed the ZBA. This appeal by Objector followed.

## II. Issues

On appeal,[2] Objector raises seven issues in its Statement of Questions Involved.[3] However, Objector's issues can be consolidated into two primary issues: (1) whether the ZBA lacked subject matter jurisdiction over Applicant's variance request where Applicant lacked standing to file the application; and, (2) whether the

---

[2] Because the parties presented no additional evidence after the ZBA's decision, our review is limited to determining whether the ZBA committed an abuse of discretion or an error of law. Soc'y Hill Civic Ass'n v. Phila. Zoning Bd. of Adjustment, 42 A.3d 1178 (Pa. Cmwlth. 2012).

[3] Specifically, Objector's Statement of Questions Involved states:

> 1. Did the [ZBA] (and henceforth the [trial court]) have jurisdiction to hear and adjudicate [Applicant's] zoning application?
>
> 2. If the [ZBA] and the [trial court] had jurisdiction to hear and/or adjudicate [Applicant's] zoning application—which neither did, did [Applicant] have standing before the [ZBA] or the [trial court]?
>
> 3. Did the [ZBA] and the [trial court] abuse their discretion and commit an error of law when [they] granted variance relief to [Applicant] and affirmed the granting of the same?
>
> 4. Did the [ZBA] and the [trial court] abuse their discretion and commit an error of law when they determined [Applicant] established hardship?
>
> 5. Did the [ZBA] and the [trial court] abuse their discretion and commit an error of law when they determined that the variance would not adversely affect the public safety, health and general welfare?
>
> 6. Did the [ZBA] and the [trial court] abuse their discretion and commit an error of law when they determined that the variance will represent the minimum variance that will afford relief?
>
> 7. Did the [ZBA] and the [trial court] abuse their discretion and commit an error of law when they prevented questioning regarding record evidence, which was then relied upon in granting and affirming the variance relief?

Appellant's Br. at 5-6.

11

ZBA erred in granting the requested variance where Applicant did not satisfy the criteria necessary to obtain a variance.

### III. Discussion
### A. Subject Matter Jurisdiction/Standing
### 1. Contentions

Objector first argues the ZBA had no jurisdiction to grant the variance here because Applicant had no authority to file the underlying zoning application, and the record lacks any evidence to the contrary. Objector asserts this Court holds that zoning boards are administrative agencies created by the General Assembly and their jurisdiction is only that which the legislature expressly conveyed or which is necessary by implication. Joe Darrah, Inc. v. Zoning Hearing Bd. of Spring Garden Twp., 928 A.2d 443 (Pa. Cmwlth. 2007). Objector contends the Zoning Code grants the ZBA the power to, among other things, "authorize variances from the terms of th[e] Zoning Code," after public notice and a public hearing. See Section 14-103(4)(a)(.3) of the Zoning Code. However, Objector maintains, a variance may only be granted on a duly authorized Application for Zoning/Use Registration Permit, and Applicant had no authority to file the Application here.

Objector argues the Zoning Code dictates who may file a zoning application. Section 14-303(1)(b) of the Zoning Code states that an Application for Zoning/Use Registration Permit "may only be filed by (a) a department or agency of the City or (b) the property owner, except as provided in § 14-303(1)(c) (Equitable Owners, Authorized Agents, and Conservators)." Id. (emphasis added). In turn, Section 14-303(1)(c)(1) states: "Any person or entity with written documentation of equitable ownership of that real property" may file a zoning application. Id.

12

(emphasis added). Objector asserts that, premised on Section 14-303(1)(c), the ZBA's Rules and Regulations mandate that an applicant seeking zoning relief from the ZBA must submit: "Proof of legal or equitable interest in the property in question, such as a fully-signed deed, agreement of sale, lease or similar instrument." Section 5.2.3.1 of the ZBA Rules & Regulations; Reproduced Record (R.R.) at 532a (emphasis added).

Therefore, Objector contends, to be authorized to file the application, Applicant must, at the time of filing, have been (1) the legal owner of the subject property, or (2) the equitable owner of the subject property with written proof of its equitable ownership. Objector maintains Applicant was neither the legal nor equitable owner, so it filed the application without authority to do so under the Zoning Code and the ZBA's Rules and Regulations.

As to legal ownership, Objector argues, at all relevant times, the legal owners of the subject property were Irene and Constantinos Vouladas, not Applicant. Applicant asserts the Office of Property Assessment (OPA) records and the deed for the subject property that Applicant presented at the hearing confirm that Irene and Constantinos Vouladas are the subject property's legal owners. R.R. at 186a-191a. Further, as to equitable ownership, Objector contends, the record includes an executed agreement of sale, dated November 19, 2015, in which Irene Vouladas agreed to sell and RLDL Spruce LLC agreed to purchase the subject property. R.R. at 241a-252a. Objector points out that, at oral argument before the trial court, Applicant asserted the agreement of sale included language allowing it to be assigned; however, Objector maintains, the record does not include an assignment.

13

Because Applicant was neither the legal nor equitable owner of the subject property, Objector argues, there is no dispute that Applicant improperly filed the application. Objector asserts the record lacks any evidence to the contrary, and this Court's review is limited to the record on appeal. In fact, Objector contends, Applicant's own documents, the subject property's deed and the OPA records as well as the executed agreement of sale, make clear that Irene and Constantinos Vouladas are the legal owners of the subject property and that RLDL Spruce LLC— not Applicant—is the equitable owner. Thus, Objector maintains, the application was null and void because Applicant filed it impermissibly. Objector argues the ZBA was conferred no jurisdiction by virtue of Applicant's application for appeal, and the variance at issue is void *ab initio*. Because the ZBA had no jurisdiction, Objector asserts, the trial court had no jurisdiction and now this Court lacks jurisdiction, so this Court must vacate the variance it granted to Applicant.

Objector further contends there was no executed written assignment of the agreement of sale here. Therefore, it asserts, Applicant had no equitable interest in the subject property at any relevant time. As such, Objector argues the ZBA and the trial court erred in holding Applicant was the equitable owner of the subject property by way of an assignment. Specifically, Objector asserts the trial court held, "there is sufficient evidence of the equitable ownership of [A]pplicant, including among other bases, the testimony of [Applicant's Representative] at the [ZBA] hearing, and the fact that the assignment itself is not of record is immaterial." R.R. at 719a. Objector argues the trial court abused its discretion in determining there was *any* evidence, let alone, sufficient evidence of Applicant's equitable ownership.

14

Additionally, Objector maintains, the trial court erred in finding it immaterial that the record did not contain the assignment.

Objector points out that Applicant argues it was the equitable owner of the subject property by way of an assignment of the agreement of sale from RLDL Spruce LLC to Applicant. Objector asserts that, although RLDL Spruce LLC was permitted to assign its rights under the agreement of sale, there is no record evidence it did so.

Objector contends Applicant's Representative testified, as the corporate representative of Applicant, that he was the equitable owner of the subject property.

> Q: David, you are the equitable owner of the property under agreement of sale?
>
> A: Correct. Yes.

R.R. at 35a. Objector argues this single question and answer is Applicant's Representative's complete testimony regarding Applicant's equitable ownership of the subject property. Objector asserts Applicant's Representative did not mention an assignment of the agreement of sale. Further, Objector contends, Applicant's counsel did not mention an assignment when he informed the ZBA that he had an agreement of sale when questioned by the ZBA Chairman. R.R. at 33a-34a. Again, Objector maintains, that single question and answer is Applicant's counsel's complete statement regarding Applicant's documentary evidence of its equitable ownership.

15

Moreover, Objector asserts, when the parties appeared before the trial court at oral argument, and the issue of jurisdiction arose, the trial court expressly asked Applicant's counsel: "Q: Is there any evidence in the record that would indicate that your client had the authority or had the assignment of the property?" In response, Applicant's counsel stated: "My client is a member of both entities, RLDL Spruce, LLC and Hightop Brown, LLC." R.R. at 703a.

Notably, Objector contends, Applicant's counsel made no reference to an assignment of the agreement of sale, which the trial court realized because it followed up by asking: "Right. But is there evidence in the record that was before the ZBA that would have supported that finding?" Id. Objector maintains Applicant's counsel still made no reference to an assignment of the agreement of sale. Rather, he answered:

> Other than the fact that it is in the agreement of sale, and it's expressly permitted that the assignment is there and to the extent that the applicant is referred to as Hightop Brown or RLDL Spruce, LLC, single member - I mean, single purpose LLCs that were created for the purpose of purchasing this property.
>
> My client is still the equitable owner of the [subject] property. [It is] not the owner of the [subject] property because ownership is contingent upon obtaining full and unappealable zoning relief. ...

Id. Objector asserts Applicant's counsel had no knowledge of an actual, written assignment of the agreement of sale. Despite this fact, Objector contends, a purported assignment was presented (not as part of the record) to the trial court at oral argument regarding jurisdiction.

16

Objector further maintains that as a matter of law an assignment of the agreement of sale had to be in writing based on the Statute of Frauds.[4] Trowbridge v. McCaigue, 992 A.2d 199 (Pa. Super. 2010); Strausser v. Pramco, III, 944 A.2d 761, 765 (Pa. Super. 2008). Objector argues, it is indisputable that, as found by the trial court and admitted to by Applicant's counsel, there is no written assignment of the agreement of sale in the record. Therefore, Objector asserts, because the assignment must be in writing to satisfy the Statute of Frauds, the trial court erred in concluding that the fact that the assignment itself is not of record is immaterial. R.R. at 719a.

Objector further contends, because the ZBA had no jurisdiction, and the trial court had no jurisdiction, this Court now lacks jurisdiction. Objector argues that if an adjudicative body below lacks subject matter jurisdiction, an appellate court does not acquire it on appeal. Fircak v. N. Strabane Twp. (Pa. Cmwlth., No. 1942 C.D. 2011, December 5, 2012), 2012 WL 8699987 (unreported). Here, Objector argues, Applicant improperly filed the application without the requisite authority, as it was neither the legal nor equitable owner. Thus, Objector asserts the application was void *ab initio* and conferred no jurisdiction on the ZBA.

Moreover, Objector contends, even if this Court determines the ZBA had jurisdiction to grant the variance, and that the trial court and now this Court have jurisdiction on appeal from that grant by the ZBA, Applicant lacks standing because it is not an aggrieved party under Pennsylvania law and because it has no ownership interest in the subject property. Specifically, Objector argues, Applicant lacks

---

[4] Act of March 21, 1772, 33 P.S. §§1–8.

17

standing because it can demonstrate no direct or actual aggrievement—a legal requirement for standing.

Objector points out that the trial court held that the issue of standing was waived because it was not raised at the ZBA hearing. The trial court further stated that the case Objector relied on was distinguishable as it related to the standing of a protestant rather than an applicant as is the case here. R.R. at 719a. Objector notes the case on which it relied was Scott 2015. Objector asserts the trial court did not address the merits of Objector's standing argument based on its determination that Objector waived that issue.

Objector argues Pennsylvania courts hold that a land use appeal is moot for lack of standing where a party has no ownership interest in the property at issue. See Gwynedd Props. v. Bd. of Supervisors of L. Gwynedd Twp., 635 A.2d 714 (Pa. Cmwlth. 1993); see also Peach Bottom Twp. v. Peach Bottom Zoning Hearing Bd., 526 A.2d 837 (Pa. Cmwlth. 1987). As set forth above, Objector maintains, Applicant has no ownership interest in the subject property; therefore, it lacks standing in this appeal.

Moreover, Objector asserts, Applicant is not an aggrieved party and, thus, has no standing here. Specifically, Objector contends, Applicant can show no substantial, direct or immediate interest. See William Penn Parking Garage v. City of Pittsburgh, 346 A.2d 269 (Pa. 1975); see also Spahn v. Zoning Bd. of Adjustment, 977 A.2d 1132 (Pa. 2009). With the understanding that Applicant has no standing

18

in this appeal based on an analysis of the merits of standing requirements, Objector argues, the only issue is whether Objector waived a standing challenge.

Objector concedes it first raised the issue of standing before the trial court and not before the ZBA. However, it asserts, in line with re reasoning of recent Pennsylvania standing cases in zoning appeals, it raised the issue at the first opportunity to do so. Therefore, Objector maintains, the trial court's decision not to follow the Supreme Court's decision in Scott 2015 was in error. To that end, Objector argues, there is no dispute that in Scott 2015, the Supreme Court addressed an appellant's standing in a land use appeal and held, "to appeal from the [ZBA] to the trial court, an appellant must demonstrate in the trial court, if challenged, that he is aggrieved pursuant to William Penn and as applied in Spahn, and may not avoid this obligation by arguing that the landowner failed to challenge standing before the ZBA." Scott 2015, 126 A.3d at 949. Objector maintains the same analysis should apply when a protestant challenges an applicant's standing. Indeed, Objector argues, Scott 2015 calls into question whether standing can even be waived in Philadelphia, if not raised before the ZBA.

### 2. Analysis

Contrary to Objector's assertions, "the courts of this Commonwealth view the issue of standing as nonjurisdictional and waivable." In re Condemnation by Urban Redevelopment Auth. of Pittsburgh, 913 A.2d 178, 181 n.6 (Pa. 2006) (emphasis added); Twp. of Bristol v. 1 Enters., LLC, ___ A.3d ___, ___ (Pa. Cmwlth., Nos. 658, 727 C.D. 2017, filed January 5, 2018), slip op. at 10, 2018 WL

19

296835 at *5 (citing Commonwealth v. Allen, 107 A.3d 709, 711 n.1 (Pa. 2014); City of Phila. v. Rivera, 171 A.3d 1, 6 (Pa. Cmwlth. 2017)) ("Lack of standing is not a jurisdictional defect."); Hous. Auth. of City of Pittsburgh v. Van Osdol, 40 A.3d 209, 214 (Pa. Cmwlth. 2012) ("Standing is a non-jurisdictional and waivable issue.").

Indeed, the law is well-established that "the question of standing is not an issue of subject matter jurisdiction and, therefore, may not be raised *sua sponte*." Firearm Owners Against Crime v. L. Merion Twp., 151 A.3d 1172, 1180 n.10 (Pa. Cmwlth. 2016) (citing Hertzberg v. Zoning Bd. of Adjustment, 721 A.2d 43 (Pa. 1998)); see also In re Nomination Petition of DeYoung, 903 A.2d 1164 (Pa. 2006). Thus, we reject Objector's thinly-veiled attempt to recast its standing argument as implicating subject matter jurisdiction.

Further, Objector concedes it did not raise the issue of Applicant's standing to file the Application for Zoning/Use Registration Permit or to seek the requested variance before the ZBA. See Appellant's Br. at 32. Therefore, this issue is waived. THW Grp., LLC v. Zoning Bd. of Adjustment, 86 A.3d 330, 343-44 (Pa. Cmwlth. 2014) (objectors waived argument that applicant lacked standing to obtain requested use permit on the ground that applicant did not have an ownership interest in property when it filed the application where objectors did not raise standing issue before ZBA); see also Scott v. Zoning Bd. of Adjustment (Pa. Cmwlth., 358 C.D. 2015, filed April 13, 2017), slip op. at 14, 2017 WL 1365601 at *7 n.16 (unreported)

(Scott 2017)[5] ("While [the objector] questioned the [p]roperty's ownership and the ZBA's failure to obtain proof of the [p]roperty's ownership in his brief to this Court, [the objector] failed to properly preserve such issue on appeal because he failed to raise it in his 1925(b) Statement. See Pa. R.A.P. 1925(b)(4)(vii). … In addition, [the objector] did not raise this issue or object to [the applicants'] failure to submit such documentation into the record at the time of the ZBA hearing. For all of these reasons, we will not address [the objector's] arguments relative to the ownership of the [p]roperty.") (emphasis added).[6]

Moreover, Scott 2015, relied on by Objector, does not compel a different result. There, the applicant sought and obtained variances before the ZBA. An objector appealed the grant of the variances, and the applicant challenged the objector's standing to appeal. The trial court agreed with the applicant that the objector lacked standing to appeal, and it quashed the objector's appeal. On further appeal, this Court held the applicant waived its challenge to the objector's standing by failing to raise it before the ZBA. Ultimately, the Supreme Court disagreed with this Court's holding, explaining (with emphasis added):

> Zoning in the [City] is governed by the Zoning Code … as well as the [First Class City] Home Rule Act [(Home Rule Act)[7]], rather than the [Pennsylvania

---

[5] Pursuant to 210 Pa. Code §69.414, an unreported panel decision of this Court, issued after January 15, 2008, may be cited for its persuasive value, but not as binding precedent.

[6] In addition to failing to raise its challenge to Applicant's standing to seek the requested zoning relief before the ZBA, Objector did not raise this issue in its initial brief to the trial court. Reproduced Record (R.R.) at 333a-363a. Nor did it seek to present additional evidence before the trial court in support of its newly raised standing challenge. Rather, Objector first raised this issue at the March 2017 oral argument before the trial court.

[7] Act of April 21, 1949, P.L. 665, as amended, 53 P.S. §§13101-13157.

21

Municipalities Planning Code (MPC)[8]]. The Philadelphia Code, unlike the MPC, provides no definition of who is a party before the [ZBA] and does not limit who may appear and participate in a zoning hearing. Once an appeal is properly brought before the [ZBA], as it was by [the applicant] as appellant from the decision of [L&I], no other person who appears at the zoning hearing is required to have standing. As the City emphasizes, anyone is free to attend and address the [ZBA] at its hearings. In stark contrast to the MPC, attending and participating at the hearing does not confer standing to appeal to the trial court or render an individual 'necessarily aggrieved' to appeal an adverse decision. Rather, as this Court decided in Spahn, the Home Rule Act defines who may appeal from the [ZBA] to the trial court.

Specifically, Section 17.1 of the Home Rule Act,[9] 53 P.S. § 13131.1, provides standing in appeals from zoning matters in [the City], as a city of the first class, to 'any aggrieved person' as follows:

> In addition to any aggrieved person, the governing body vested with legislative powers under any charter adopted pursuant to this act shall have standing to appeal any decision of a zoning hearing board or other board or commission created to regulate development within the city. As used in this section, the term 'aggrieved person' does not include taxpayers of the city that are not detrimentally harmed by the decision of the zoning hearing board or other board or commission created to regulate development.

Section 17.1 of the Home Rule Act is contrary to the Philadelphia Code, which broadly granted standing to any taxpayer under Section 14–1807(1) ('Any person or persons jointly or severally aggrieved by any decision of the Board, or any taxpayer, or any officer, department,

---

[8] Act of July 31, 1968, P.L. 805, as amended, 53 P.S. §§10101-11202.

[9] Section 17.1 was added by the Act of November 30, 2004, P.L. 1523.

board or bureau of the City, may appeal ….'). We resolved this conflict in Spahn.

Specifically, in Spahn, we addressed, *inter alia*, whether by enacting Section 17.1 of the Home Rule Act the General Assembly had eliminated general taxpayer standing in Philadelphia and whether the appellants in fact had standing to pursue zoning challenges under traditional notions of standing. In resolving the question of Section 17.1, we held that by its plain language, the General Assembly intended 'to give the specific power of standing to appeal a decision of a zoning hearing board within a city of the first class to the governing body vested with legislative powers and to 'aggrieved persons,' Spahn, 977 A.2d at 1143, and that the local Philadelphia Code must cede to this legislative enactment. We further held that the General Assembly intended the term 'aggrieved person' as it is generally understood and defined in William Penn. Under William Penn, a party is aggrieved if the party can show an interest that is substantial, direct, and immediate. Spahn, 977 A.2d at 1151 (citing William Penn, 346 A.2d at 280). We did not discuss whether a landowner was obligated to challenge an objector's standing before the [ZBA], or otherwise address the timing of a challenge to standing.

Considering [the] legislative and precedential framework for zoning appeals in Philadelphia, we agree with the City and with [the applicant] that although anyone may appear before the [ZBA], to appeal a decision of the [ZBA] to the trial court it is necessary for the appellant to demonstrate that he or she is 'an aggrieved person' as Section 17.1 requires and we defined in Spahn. A party is not necessarily aggrieved simply because he or she appeared or participated before the [ZBA]. Rather, to appeal from the [ZBA] to the trial court, an appellant must demonstrate in the trial court, if challenged, that he is aggrieved pursuant to William Penn and as applied in Spahn, and may not avoid this obligation by arguing that the landowner failed to challenge standing before the [ZBA]. It would be futile, and contrary to the law, to require a landowner to challenge the standing of everyone who participates before the [ZBA], when there is no

23

requirement that participation before the [ZBA] requires standing at that stage. Moreover, because the ability to appear and participate before the [ZBA] is distinct from standing to appeal the [ZBA's] decision to the trial court, the first time [the applicant] could challenge [the] [o]bjector's standing to appeal in this case was when [the] [objector] took the appeal to the trial court. [The applicant's] challenge to [the] [o]bjector's standing was, therefore, timely.

Scott, 126 A.3d at 948-49.

Unlike Scott 2015, the case presently before us does not concern the issue of standing as it relates to an objector's ability to appeal a ZBA decision to the trial court, nor does it concern the timing of an applicant's challenge to an objector's standing. Rather, this case concerns Objector's challenge to Applicant's standing to seek zoning relief for its proposed use of the subject property based on whether Applicant possessed the requisite ownership interest to seek zoning relief. As such, the concerns set forth by our Supreme Court in Scott 2015 (regarding the onerous burden that would be placed on an applicant to challenge the standing of anyone who participates before the ZBA where there is no requirement that participation before the ZBA requires standing) are not present here.

Therefore, if Objector here had concerns regarding Applicant's ownership interest in the subject property, and, as a result, Applicant's authority to file the initial application and its ability to seek zoning relief before the ZBA, there is no reason why Objector could not have raised those concerns at the ZBA hearing. This is particularly true given that Applicant submitted the agreement of sale, OPA records and the deed for the subject property at the ZBA hearing. R.R. at 33a-34a, 186a-191a, 241a-251a. Had Objector raised an issue as to Applicant's standing to

24

file the initial application and to seek zoning relief before the ZBA based on Applicant's purported lack of an ownership interest in the subject property, Applicant would have had the ability to create a more developed record on this issue before the ZBA.[10]

**B. ZBA's Grant of Variance**
**1. Unnecessary Hardship**
**a. Contentions**

As to the merits, Objector argues the ZBA and the trial court abused their discretion and committed errors of law in granting variance relief to Applicant for the subject property. First, Objector contends there is no unnecessary hardship unique to the subject property. It maintains that the Supreme Court holds that, for the grant of a use variance, the establishment of the required unnecessary hardship occurs through evidence that: (a) the physical features of the property are such that it cannot reasonably be used for a permitted purpose; or (b) the property can be conformed for a permitted use only at a prohibitive expense; or, (c) the property has no value for any purpose permitted under the Zoning Code. Hertzberg.

---

[10] In any event, even if not waived, Objector's argument fails. More particularly, pursuant to Section 14-303(1)(c)(.1) of the Zoning Code, "whenever the legal owner of real property is authorized to file an application under this Zoning Code, that application may also be filed by … [a]ny person or entity with written documentation of equitable ownership of that real property[;] [or] … [a]ny person or entity… with signed written authorization from the legal owner [or] equitable owner …." Here, in its decision, the ZBA found that Applicant is the equitable owner of the subject property. ZBA Op., 11/23/16, Finding of Fact (F.F.) No. 1. This finding is directly supported by Applicant's Representative's testimony. R.R. at 35a.

In addition, contrary to Objector's assertions, as this Court noted in Scott v. Zoning Board of Adjustment (Pa. Cmwlth., 358 C.D. 2015, filed April 13, 2017), slip op. at 14, 2017 WL 1365601 at *7 n.16 (unreported), "while Section 14-303(1) of the [Philadelphia] Zoning Code permits equitable owners with written documentation thereof to file zoning applications, there is no requirement contained therein that such written documentation be submitted into evidence at the ZBA hearing." Id. (emphasis added).

25

Objector asserts Pennsylvania courts hold that economic hardship, by itself, will not sustain the grant of a variance and economic hardship will never be sufficient to justify a variance where it is a question of more profit from one type of development than another. See, e.g., Hipwell Mfg. Co. v. Zoning Bd. of Adjustment of City of Pittsburgh, 452 A.2d 605 (Pa. Cmwlth. 1982). Moreover, Objector contends, the Supreme Court holds that the inability to develop a property as profitably as possible does not constitute hardship. Hertzberg.

Objector argues the subject property's physical features do not impinge on Applicant's ability to use the subject property for a permitted purpose. Objector points out that the subject property is an almost perfectly square corner lot, comprised of 8,762 square feet, at the intersection of North Sixth and Brown Streets, in the ICMX district, and it is improved with a one-story mixed commercial-industrial building. In fact, Objector contends, Applicant admits that there is nothing physically unique about the subject property. R.R. at 60a.

Objector maintains the only testimony regarding an inability to use the subject property based on its physical characteristics arose from Applicant's Commercial Real Estate Broker. R.R. at 39a. Objector argues Applicant's Commercial Real Estate Broker testified the only physical characteristic of the building that detracted from its usability and value were ceiling heights of less than 10 feet, although he admitted he did not measure the ceiling heights. R.R. at 47a-48a. Objector asserts the building on the subject property has ceiling heights over 13 feet. R.R. at 384-85a. Thus, Objector maintains, the ZBA erred in finding the unique physical characteristics of the subject property are such that it cannot reasonably be used for a permitted purpose.

Objector further argues the subject property can be used for a permitted use as it currently exists. Objector asserts the ZBA and the trial court abused their discretion in finding that there was a lack of any viable uses of the subject property for retail or industrial purposes. R.R. at 92a, 710a. Objector asserts the record does not support this finding.

Objector further contends Applicant's Representative stated, "after the cost of renovation, of demolition" he could not "find a tenant to pay any kind of market rent that would make this project work" for any ICMX permitted use, and based on his economic modeling for "allowed uses in ICMX and industrial" districts there is no "scenario where [he] could utilize the property with an ICMX use and not lose money." R.R. at 86a. In fact, he stated: "The property, as it is zoned currently, is valueless. There's no value." Id. Applicant's Representative added that even if he acquired the subject property for free, there were no viable commercial or industrial uses. R.R. at 86a. However, Objector maintains, Applicant's Representative admitted he did nothing to determine possible uses for the subject property:

> Q: Have you sought … to find out if there are any other uses for the building as is?
>
> A: As is?
>
> Q: Yeah. Rent it?
>
> A: No.

27

R.R. at 60a. Ironically, Objector argues, after Applicant's Representative undercut his own testimony, Applicant's Commercial Real Estate Broker refuted Applicant's Representative's testimony, stating, the worth or value of the subject property in its current condition "is predicated upon what you would pay for the land." R.R. at 47a.

Moreover, Objector asserts, Applicant's Commercial Real Estate Broker opined that the subject property was not rentable *for retail uses*. R.R. at 39a, 41a. Objector contends Applicant's Commercial Real Estate Broker further testified that potential "as-is" uses for the subject property included a gym location or a commercial contracting business. R.R. at 50a, 52a. Objector also points out that Applicant's Commercial Real Estate Broker expressly disclaimed expertise on industrial zoning and uses. R.R. at 49a-50a.

Objector maintains Applicant's Commercial Real Estate Broker admitted his testimony was given without the knowledge that there was a performing tenant in the subject property. R.R. at 52a. In fact, Objector argues, Applicant's Commercial Real Estate Broker was only involved with the project for "about a week" before the ZBA hearing, so it is not surprising he was not sufficiently knowledgeable about the subject property. R.R. at 48a. Thus, Objector contends the record shows the subject property can be used "as-is."

Objector further maintains the subject property is not valueless. Objector argues that in Hertzberg, the Supreme Court held that one way of showing hardship is to show the property has no value for any purpose permitted under the Zoning Code, which is what Applicant attempted to do here. Since Hertzberg,

28

Objector acknowledges, the Supreme Court clarified that to establish hardship an applicant is not required to: (a) "show that the property at issue is valueless without the variance or that the property cannot be used for any permitted purpose;" or (b) prove it has been unable to sell the property. Marshall, 97 A.3d at 330. However, Objector asserts, in Marshall, the Court made clear that in determining whether hardship exists, a showing that a property is valueless without the variance or that the property cannot be used for any permitted purpose and that the applicant has been unable to sell the property are factors to be considered.

Here, Objector contends these factors weigh against Applicant. Objector argues the record makes clear that: (1) the subject property carries significant value; and, (2) Applicant made no effort to address the subject property in any manner other than its proposed project.

Objector asserts Applicant's Commercial Real Estate Broker admitted that the 6,400 square-foot existing building, at $14 to $16 per square foot, with a triple net lease, would have a value ranging from $1.5 million to $2 million. R.R. at 46a-47a. Moreover, Objector argues, Applicant's Commercial Real Estate Broker testified that potential "as-is" uses for the subject property included a gym or commercial contracting business. R.R. at 50a, 52a.

Objector further asserts that, separate and apart from the traditional hardship criteria, the ZBA found that Applicant established hardship through the shift of the subject property's surrounding neighborhood from industrial or commercial to primarily residential. Objector argues this was error. It contends this

29

Court holds that where a landowner cannot sell his property the course of time may effect changes to that property and the surrounding area that may ultimately result in creation of an unnecessary hardship that did not previously exist, where the property may once have not been burdened by an unnecessary hardship. South of South Street Neighborhood Ass'n. However, Objector maintains, where, as here, the property owner neither attempted to sell nor rent its property it may not avail itself of this "change of circumstances" hardship.

**b. Analysis**

As fact-finder, the ZBA is the sole judge of the credibility and weight of the evidence presented. Tri-County Landfill, Inc. v. Pine Twp. Zoning Hearing Bd., 83 A.3d 488 (Pa. Cmwlth. 2014). As a result, the ZBA is free to reject even uncontradicted evidence that it finds lacking in credibility. Id. The ZBA is free to accept or reject, in whole or part, the testimony of any witness. Domeisen v. Zoning Hearing Board, O'Hara Twp., 814 A.2d 851 (Pa. Cmwlth. 2003). Our review of the ZBA's factual findings is limited to determining whether the ZBA's findings of fact are supported by substantial evidence. Tri-County Landfill.

Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Oasis v. Zoning Hearing Bd. of S. Annville Twp., 94 A.3d 457 (Pa. Cmwlth. 2014). When performing a substantial evidence analysis, courts must view the evidence in the light most favorable to the party who prevailed before the fact-finder. In re McGlynn, 974 A.2d 525 (Pa. Cmwlth. 2009). It is irrelevant whether the record contains evidence to support findings other than those made by the fact finder; the critical inquiry is whether there is evidence to support the findings actually made. Keslosky v. Old Forge Civil Serv.

Comm'n, 73 A.3d 665 (Pa. Cmwlth. 2013). If there is, an appellate court may not disturb the findings. Id.

An applicant seeking a variance must prove that unnecessary hardship will result if the variance is denied and that the proposed use is not contrary to the public interest. Valley View Civic Ass'n v. Zoning Bd. of Adjustment, 462 A.2d 637 (Pa. 1983). When an applicant seeks a variance for a property located in the City, the ZBA must also consider the factors set forth in the Zoning Code.[11] Singer

---

[11] Specifically, Section 14-303(8)(e)(1) of the Zoning Code states that the ZBA shall grant a variance only if it finds each of the following criteria are satisfied:

> (.a) The denial of the variance would result in an unnecessary hardship. The applicant shall demonstrate that the unnecessary hardship was not created by the applicant and that the criteria set forth in § 14-303(8)(e)(.2) (Use Variances) below, in the case of use variances … have been satisfied;

> (.b) The variance, whether use or dimensional, if authorized will represent the minimum variance that will afford relief and will represent the least modification possible of the use or dimensional regulation in issue;

> (.c) The grant of the variance will be in harmony with the purpose and spirit of this Zoning Code;

> (.d) The grant of the variance will not substantially increase congestion in the public streets, increase the danger of fire, or otherwise endanger the public health, safety, or general welfare;

> (.e) The variance will not substantially or permanently injure the appropriate use of adjacent conforming property or impair an adequate supply of light and air to adjacent conforming property;

> (.f) The grant of the variance will not adversely affect transportation or unduly burden water, sewer, school, park, or other public facilities;

v. Phila. Zoning Bd. of Adjustment, 29 A.3d 144, 148 (Pa. Cmwlth. 2011). Essentially, an applicant seeking a variance pursuant to the Zoning Code must show: (1) the denial of the variance will result in unnecessary hardship unique to the property; (2) the variance will not adversely impact the public interest; and, (3) the variance is the minimum variance necessary to afford relief. Id. The burden on an applicant seeking a variance is a heavy one, and the reasons for granting the variance must be substantial, serious and compelling. Id.

In its decision in Marshall, which also involved the ZBA's grant of a use variance, our Supreme Court stated: "It is the function of the [ZBA] to determine whether the evidence satisfies the criteria for granting a variance." Id. at 331. The Supreme Court also reminded this Court that "[a]n appellate court errs when it substitutes its judgment on the merits for that of a zoning board." Id. (citation omitted). Thus, in reversing this Court's decision that overturned decisions of the trial court and the ZBA that granted an applicant's request for a use variance, the Supreme Court explained:

> While an appellate court might disagree with the [ZBA's] decision, the decision was within the bounds of reason and therefore represented a sound exercise of discretion. The Commonwealth Court's decision indicates no evidence to the contrary. There was no abuse of discretion here. It was error, therefore, for the Commonwealth Court to

---

(.g) The grant of the variance will not adversely and substantially affect the implementation of any adopted plan for the area where the property is located; and

(.h) The grant of the variance will not create any significant environmental damage, pollution, erosion, or siltation, and will not significantly increase the danger of flooding either during or after construction, and the applicant will take measures to minimize environmental damage during any construction.

substitute [its] judgment on the merits for that of the [ZBA]. Doing so was beyond the scope of [the court's] power to review.

Id. at 334 (citations and quotations omitted). The Court in Marshall explained that the ZBA's findings are owed deference, particularly its determination that a variance applicant satisfied the unnecessary hardship criterion. This is particularly so in light of the ZBA's "expertise in and knowledge of local conditions." Id. at 333. Additionally, in Marshall, the Court placed considerable weight on the community support for the applicant's proposal.

With regard to a use variance, Section 14–303(8)(e)(.2) of the Zoning Code states that, "[t]o find an unnecessary hardship in the case of a use variance, the [ZBA] must make all of the following findings":

(.a) That there are unique physical circumstances or conditions (such as irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions) peculiar to the property, and that the unnecessary hardship is due to such conditions and not to circumstances or conditions generally created by the provisions of this Zoning Code in the area or zoning district where the property is located;

(.b) That because of those physical circumstances or conditions, there is no possibility that the property can be used in strict conformity with the provisions of this Zoning Code and that the authorization of a variance is therefore necessary to enable the viable economic use of the property;

(.c) That the use variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and

33

(.d) That the hardship cannot be cured by the grant of a dimensional variance.

Section 14–303(8)(e)(2) of the Zoning Code.

Further, in <u>Marshall</u>, our Supreme Court explained:

This Court has previously held that, in the context of use variances, unnecessary hardship is established by evidence that: (1) the physical features of the property are such that it cannot be used for a permitted purpose; **or** (2) the property can be conformed for a permitted use only at a prohibitive expense; **or** (3) the property has no value for any purpose permitted by the zoning ordinance.

This Court has repeatedly made clear that in establishing hardship, an applicant for a variance is not required to show that the property at issue is valueless without the variance or that the property cannot be used for any permitted purpose. On several occasions, we have reversed the Commonwealth Court when it had relied on such a standard for unnecessary hardship in reversing the grant of a variance. Showing that the property at issue is valueless unless the requested variance is granted is but one way to reach a finding of unnecessary hardship; it is not the only factor nor the conclusive factor in resolving a variance request. Rather, multiple factors are to be taken into account when assessing whether unnecessary hardship has been established.

Furthermore, we have never required a property owner seeking a variance to present direct evidence as to the value of the property as zoned. In addition, although evidence of a property owner's inability to sell may be probative, we have concluded that it is unreasonable to force a property owner to try to sell his property as a prerequisite to receiving a variance.

Although a property owner is not required to show that his or her property is valueless unless a variance is granted, mere economic hardship will not of itself justify

a grant of a variance. … Particularly where a variance is sought in order to make a change from an existing use consistent with the zoning code to an inconsistent use, the mere fact that the property would increase in value … if a variance were granted, is not of itself a sufficient basis upon which to find unnecessary hardship.

However, a zoning board's discretion is not so circumscribed as to require a property owner to reconstruct a building to a conforming use regardless of the financial burden that would be incident thereto. … Thus, economic factors are relevant, albeit not determinative, in a variance assessment.

Marshall, 97 A.3d at 330-31 (emphasis in original) (citations and quotations omitted).

In addition, evidence of a building's vacancy and unmarketability may contribute to a finding of a unique hardship on a property. See, e.g., South of South Street Neighborhood Ass'n (holding that building's long-term vacancy and applicant's sustained, unsuccessful attempt to sell property for permitted industrial use established unnecessary hardship that would support grant of use variance).

With regard to unnecessary hardship, the ZBA made the following relevant findings and conclusions here (with emphasis added):

8. The [subject] [p]roperty is improved with a one-story structure that [Applicant's counsel] described as a 'blighted ... former industrial building' that had been 'mostly vacant for some time.' 6/22/2016 N.T. at 3.

9. The area surrounding the [subject] [p]roperty is 'a mix of RM-1, RSA-5, IRMX, and CMX-2.' 6/22/2016 N.T. at 5.

10. [Applicant's counsel] described the surrounding area as including a number of residential uses:

> To the north there is a series of single family houses. To our west there is a school. To the east there are multi[-]family houses. And directly to the east is a large 61-unit, multi[-]family building. And to our south is also a couple of multi[-]family properties as well.

> 6/22/2016 N.T. at 5-6.

11. [Applicant's counsel] submitted a list identifying eleven multi[-]family residential uses in the immediate vicinity, including a 61[-]unit multi[-]family dwelling located on the adjacent property at 710-20 North 6th Street that was approved by variance in 2001. *See* List of multi[-]family uses and attached zoning records for 710-20 North 6th Street.

* * * *

15. [Applicant's Architect] said in designing the proposed multi[-]family dwelling 'we looked at adjacent land uses and the adjacent zoning' then 'tried to ... design this project based on an IRMX use.' 6/22/2016 N.T. at 5-6.

16. [Applicant's Architect] described the proposal as 'pretty consistent with everything around us' and said 'we believe that we comply with that IRMX use with the area, the heights, the uses that are in the buildings, as well as our adjacent property.' 6/22/2016 N.T. at 12.

17. [Applicant's Architect] estimated the height of the adjacent multi[-]family building to be approximately '55 feet to the roofline.' 6/22/2016 N.T. at 7.

* * * *

19. [Applicant's Representative] said that during the due diligence period, he 'reviewed leases, seller documentation' and 'did an inspection of the [subject] property and obviously ran financial analyses to make sure

36

that the project made sense from an economic standpoint.' 6/22/2016 N.T. at 8.

20. Describing the [subject] [p]roperty's rental history, [Applicant's Representative] said 'the property consists of four spaces, and there is a long history of vacancy.' He then identified the prior uses by space, saying space A 'was a kitchen business that went out of business in 2009,' space B a 'grocery store that went out of business in 2014,' space C a 'gym and karate space' that 'vacated in January of 2016,' and space D occupied by tenants who chose not to renew their lease when it expired in November 2015 and remained at the [subject] [p]roperty 'on a month-to-month lease' while 'looking for a new space.' 6/22/2016 N.T. at 9.

21. [Applicant's Representative] noted that the prior tenants of space B 'were delinquent in their rent month after month' and that the prior tenants of space C 'were three to six months in arrears in rent' and in default under their lease when they vacated the [subject] [p]roperty in January, 2016. 6/22/2016 N.T. at 9.

22. [Applicant's Representative] described the existing structure as 'a single story, old, dilapidated, outdated warehouse' and the rental spaces as needing 'extensive renovations.' 6/22/2016 N.T. at 8-9.

23. When questioned [on direct examination] regarding the viability of ICMX uses for the site, and specifically asked if 'after the cost of renovation, of demolition' he could 'find a tenant to pay any kind of market rent that would make this project work,' [Applicant's Representative] replied 'absolutely not.' 6/22/2016 N.T. at 10.

24. [Applicant's Representative] went on to describe the steps taken to evaluate the [subject] [p]roperty's suitability for permitted ICMX uses.

> I have done extensive modeling for doing, you know, the allowed uses in ICMX and industrial. And the numbers just don't pencil out. They do not

work.  The amount of construction cost that needs to go into the building does not justify the rents that you would need to get.

6/22/2016 N.T. at 10.

25. [Applicant's Representative] submitted pro formas evaluating the feasibility of retail, industrial and residential uses of the site using a range of purchase prices –including a purchase price of zero.  The results supported his conclusion that retail and industrial uses were not viable, even assuming a zero cost.  *See* Pro Formas.

26. When asked [on direct examination] if there was 'any scenario where [he] could utilize the property with an ICMX use and not lose money, [Applicant's Representative] responded:

Absolutely not. The property, as it is zoned currently, is valueless. There's no value.

6/22/2016 N.T. at 11.

* * * *

28. On [cross-examination], [Applicant's Representative] restated his opinion that the [subject] [p]roperty cannot not be used for a permitted purpose or for houses, even if the land were acquired at no cost.  6/22/2016 N.T. at 30-31.

* * * *

32. When asked if there was a strong market for retail use at the corner of Sixth and Brown Streets, [Applicant's Commercial Real Estate Broker] said it 'is not a viable retail location or one that I would characterize with any significant retail value.' 6/22/2016 N.T. at 15.

33. [Applicant's Commercial Real Estate Broker] testified that the existing building at the [subject] [p]roperty is not, in any case, rentable in its current condition, and added:

38

> In order to make this of significant retail value ... extensive renovations would have to be employed on the property, including a complete gut renovation of all mechanical systems, new store front, new roof, all open interior demolition.

6/22/2016 N.T. at 14-15.

34. [Applicant's Commercial Real Estate Broker] opined that the [subject] [p]roperty also was not 'a viable industrial site ... [l]argely because of the physical nature of the building, the lack of high ceilings, the lack of loading, the lack of parking, as well as the surrounding nature of the building in the neighborhood.' 6/22/2016 N.T. at 17.

\* \* \* \*

42. The [ZBA] received and considered a letter from Northern Liberties Neighbors Association Zoning Chair Larry Freedman confirming the [RCO] supported the project as reflected in revised plans presented at the public meeting on the proposal.

\* \* \* \*

8. Pennsylvania appellate courts have recognized that changes to the surrounding neighborhood may give rise to unnecessary hardship. In [South of South Street Neighborhood Association 54 A.3d at 120], the Commonwealth Court noted that while 'a property may once have not been burdened by an unnecessary hardship, the course of time may effect changes to that property and the surrounding area, which may ultimately result in the creation of an unnecessary hardship that did not previously exist.' *See also* [Chosen 300 Ministries (approving [ZBA's] finding that it was not only the irregular shape of the lot that formed the basis of the hardship, but also the lack of industrial development in the neighborhood and the transitioning from industrial to commercial that created the hardship.)].

9. The Commonwealth Court has rejected the argument that an existing passive or minimal use of a property is sufficient to establish that no hardship exists. [Chosen 300 Ministries] ([v]acant property's ongoing use as a parking lot did not preclude a finding of hardship).

10. The Pennsylvania Supreme Court has 'explicitly rejected the requirement that an applicant for a variance … eliminate every possible permitted use.' [Chosen 300 Ministries, slip op. at 10, 2016 WL 224036 at *4 (quoting Marshall, 97 A.3d at 332)].

11. The [ZBA] concludes that [Applicant] here has established entitlement to the requested variance.

12. The existing building at the [subject] [p]roperty is a dilapidated warehouse that … has been vacant or underused for many years. Surrounding uses include several multi [-]family developments, including a 61[-] unit multi[-]family dwelling on the adjacent property to the east.

13. Applicant presented evidence – including credible expert testimony – sufficient to establish that uses permitted under the existing zoning are not viable and that the requested variance is the least necessary to afford relief.

* * * *

16. The project will replace a blighted, mostly vacant building with a mixed use structure that conforms to all applicable dimensional standards, is consistent with surrounding structures and uses, and provides more than the required number of [on-site] parking spaces. The proposed development is, moreover, supported by the area's RCO.

F.F. Nos. 8-11, 15-17, 19-26, 28, 32-34, 42; Concls. of Law Nos. 8-13, 16. As is clear from the record citations that accompany the ZBA's factual findings, the record supports those findings. In turn, the ZBA's factual findings support its legal

40

conclusion that Applicant proved the requisite unnecessary hardship to justify the grant of the use variance.

More particularly, the ZBA's finding of unnecessary hardship is based on its supported determinations that the subject property, which is currently improved with a mostly vacant, dilapidated warehouse, is valueless as zoned or could only be converted to a permitted use at a prohibitive expense. See F.F. Nos. 22-26, 28, 33-34; Concl. of Law No. 13. This constitutes unnecessary hardship. Marshall. Additionally, the ZBA relied on the fact that the area surrounding the subject property has transitioned from industrial to residential use. No error is apparent in that regard.

To that end, as we noted in South of South Street Neighborhood Ass'n, while "a property may once have not been burdened by an unnecessary hardship, the course of time may effect changes to that property and the surrounding area, which may ultimately result in the creation of an unnecessary hardship that did not previously exist." Id. at 120. Contrary to Objector's assertions, "[Applicant] [was] not required to present evidence that the subject property could not be utilized for its intended uses or whether there were alternative permitted uses under the [ICMX] zoning restrictions to which the subject property could be utilized for, nor [was] [Applicant] required to submit evidence that [it] attempted to sell the [subject] property to no avail." Chosen 300 Ministries, slip op. at 9-10, 2016 WL 224036 at *4. Indeed, the Supreme Court "explicitly rejected the requirement that an applicant for a variance ... eliminate every possible permitted use." Marshall, 97 A.3d at 332. Moreover, while evidence of failed attempts to sell the property "may be probative

41

… we have concluded that it is 'unreasonable to force a property owner to try to sell his property as a prerequisite to receiving a variance.'" Id. at 330 (citation omitted).

In addition, as noted above, in Marshall, the Court placed considerable weight on the community support for the applicant's proposal. Here, Northern Liberties Neighbors Association, the RCO, expressed support for Applicant's proposal. F.F. No. 42; Concl. of Law No. 16.[12]

---

[12] In a footnote, Objector argues the ZBA further erred in relying on Applicant's Representative's pro formas and economic modeling, but not allowing Objector to cross-examine Applicant's Representative about the pro formas and suggesting cost was not an issue. R.R. at 58a. Our review of the record does not support this assertion. More particularly, the page of the Reproduced Record cited by Objector reveals the following exchange:

> [Objector's Representative/Counsel]: Okay. So if you got the land for free, could you build houses and make money?
>
> [Applicant's Representative]: No.
>
> [Objector's Representative/Counsel]: Why?
>
> [Applicant's Representative]: Construction cost of each home.
>
> [Objector's Representative/Counsel]: Okay. Have you done any development in the particular Northern Liberties area?
>
> [Applicant's Representative]: I have, yes.
>
> [Objector's Representative/Counsel]: Okay. And did you build single homes?
>
> [Applicant's Representative]: I did.
>
> [Objector's Representative/Counsel]: And what did you pay for a lot of land?
>
> [The ZBA Chairman]: Cost is not the issue. Stay on this site [(the subject property)] and stay on the issue that we are talking about. The relevance to other properties' cost are not --

## 2. Public Interest
### a. Contentions

Objector next contends the ZBA erred in finding that the requested variance would not adversely affect the public safety, health or general welfare or permanently injure the use of adjacent conforming properties. Objector maintains that, not only is there not substantial evidence to support such a finding, Applicant did not present any evidence to support such a finding. In contrast, Objector asserts, it presented testimony by its Representative that the proposed use would negatively impact light and air, increase congestion and traffic in the neighborhood, and was not consistent with the character of the neighborhood. R.R. at 64a-68a. Thus, Objector argues, the ZBA and the trial court were required to make a finding adverse to Applicant here.

Moreover, Objector contends, the trial court erred in concluding that issues related to light and air were without merit given the fact that there were no dimensional variances requested. R.R. at 719a. To that end, Objector argues Section 14-303(8)(e)(1)(e) of the Zoning Code states that part of the general criteria for the grant of any variance, use or dimensional, is that "[t]he variance will not substantially or permanently injure the appropriate use of adjacent conforming property or impair an adequate supply of light and air to adjacent conforming

---

[Objector's Representative/Counsel]: Fair enough.

R.R. at 58a. Contrary to Objector's assertions, we discern no abuse of discretion in the ZBA's direction that Objector's Representative/Counsel confine his cross-examination to the costs associated with construction of various uses *on the subject property* rather than on other properties. See Pa. R.E. 401 (evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action).

43

property." Thus, Objector asserts, the trial court erred in concluding arguments relating to light and air were irrelevant.

### b. Analysis

Here, the ZBA made the following findings and conclusions on this issue (with emphasis added):

> 13. [Applicant's counsel] said his client had 'numerous meetings with the community' prior to coming before the [ZBA], and had revised the proposal in response to community requests for more on[-]site parking and 'activity along North 6th Street.[']  6/22/2016 N.T. at 4.
>
> * * * *
>
> 15. [Applicant's Architect] said in designing the proposed multi[-]family dwelling 'we looked at adjacent land uses and the adjacent zoning' then 'tried to ... design this project based on an IRMX use.'  6/22/2016 N.T. at 5-6.
>
> 16. [Applicant's Architect] described the proposal as 'pretty consistent with everything around us' and said 'we believe that we comply with that IRMX use with the area, the heights, the uses that are in the buildings, as well as our adjacent property.'  6/22/2016 N.T. at 12.
>
> * * * *
>
> 36. [Objector's Representative] … testified regarding [Objector's] objection to the proposed development.
>
> 37. When questioned by [Applicant's counsel], [Objector's Representative] acknowledged that his own building had received variances and that the additional multi[-]family units proposed for the [subject] [p]roperty would create competition for his property, which he identified as a ground for objection.  6/22/2016 N.T. at 26-27, 41.
>
> 38. [Objector's Representative] also expressed concern regarding the proposed development's impact on light and

44

air to his property and parking availability, but [he] did not dispute that the proposed height and parking were permitted by [the Zoning] Code. 6/22/2016 N.T. at 36, 40.

\* \* \* \*

42. The [ZBA] received and considered a letter from Northern Liberties Neighbors Association Zoning Chair Larry Freedman confirming the [RCO] supported the project as reflected in revised plans presented at the public meeting on the proposal.

\* \* \* \*

15. The [ZBA] … concludes that the proposed development will not negatively impact the public health, safety or welfare.

16. The project will replace a blighted, mostly vacant building with a mixed use structure that conforms to all applicable dimensional standards, is consistent with surrounding structures and uses, and provides more than the required number of [on-site] parking spaces. The proposed development is, moreover, supported by the area's RCO.

F.F. Nos. 13, 15-16, 36-38, 42; Concls. of Law Nos. 15-16. No error is apparent in the ZBA's determination that Applicant's proposed use will not adversely affect the public safety, health or general welfare and will not permanently injure the use of adjacent conforming properties. In fact, the ZBA determined Applicant's proposed use, which received support from the RCO, would harmonize with surrounding uses.

Further, while Objector offers conclusory assertions that Applicant's proposal would negatively impact light and air, increase congestion and traffic, and was not consistent with the character of the neighborhood, Objector presented no evidence to support these assertions. Rather, Objector's Representative, who is an

45

attorney, and who owns the 61-unit multi-family residential building adjacent to the subject property, briefly referenced these issues at the ZBA hearing without any support, see R.R. at 63a, 67a, and the ZBA did not credit his vague testimony. Additionally, as the ZBA found, Objector's Representative did not dispute that Applicant's proposed use complies with all of the Zoning Code's dimensional requirements, including building height. F.F. No. 38; R.R. at 63a.

### 3. Minimum Variance
### a. Contentions

Objector also argues the ZBA erred in cursorily finding and concluding that the use variance was the minimum variance necessary to afford relief. Objector asserts Pennsylvania courts have held, as far back as 1982, that a multi-unit residential developer must show that fewer units could not be built in order to obtain a variance.[13] Here, Objector argues Applicant provided no testimony relating to its inability to build fewer than the requested number of units. Objector asserts the number of units proposed here appears to be random with no testimony about the number that could be built on the subject property.

Objector further argues the ZBA erred in relying on the testimony of Applicant's Architect to substantiate its minimum variance finding. Objector asserts Applicant's Architect testified the project was designed in accordance with the IRMX district standards. R.R. at 85a. However, Objector contends, the Planning

---

[13] See In re Larsen, 616 A.2d 529 (Pa. 1992); Damico v. Zoning Bd. of Adjustment of City of Pittsburgh, 643 A.2d 156 (Pa. Cmwlth. 1994); Lipari v. Zoning Hearing Bd. of City of Easton, 516 A.2d 110 (Pa. Cmwlth. 1986); Somerton Civic Ass'n v. Zoning Bd. of Adjustment, 471 A.2d 578 (Pa. Cmwlth. 1984); Vito v. Zoning Hearing Bd. of Borough of Whitehall, 458 A.2d 620 (Pa. Cmwlth. 1983); Hipwell Mfg. Co. v. Zoning Bd. of Adjustment of City of Pittsburgh, 452 A.2d 605 (Pa. Cmwlth. 1982).

46

Commission Representative testified that the Planning Commission objected to the project's failure to provide commercial or industrial uses throughout the entirety of the first floor, which was required to comply with the IRMX district, the standards of which Applicant purportedly designed its project to satisfy. R.R. at 71a-72a.

Despite the position of the Planning Commission, Objector contends, the ZBA upheld an expanded use variance pursuant to which the first floor commercial use could be reduced from 50% to 10%. Although Applicant's Architect testified he designed the project in conformity with the IRMX standards, Objector argues, this was incorrect. Objector maintains it is undisputed that the IRMX district requires 50% commercial use on the first floor without any residential use, and Applicant's proposed use has two residential units on the first floor and only 10% commercial use. For these reasons, Objector asserts, the variance granted does not represent the minimum variance necessary to afford relief.

### b. Analysis

Contrary to Objector's assertions, in South of South Street Neighborhood Ass'n, this Court explained (with emphasis added):

> Finally, we will address the [objector's] argument that the trial court erred in affirming the ZBA's grant of the variance because the [applicant] did not request the minimum variance necessary. The [objector] contends that the variance that the ZBA granted improperly exceeds the minimum variance necessary to afford relief to [applicant]. We note, however, that this minimization requirement contained in both the MPC and the Zoning Code appears to pertain more to dimensional variance requests. The MPC specifically provides that adjudicators and reviewing courts consider the specific variance requirements identified in Section 910.2(a) of the MPC

47

when they are relevant. [53 P.S. §10910.2(a)[14]]. The rule of minimization has clear application in the context of a dimensional variance, because an applicant should be entitled to a modification of a dimensional zoning requirement only to the extent necessary to grant relief. Otherwise, an adjudicator or reviewing court could provide relief that goes beyond the necessity of curing an unnecessary hardship under the applicable zoning ordinance. In the context of a use variance, the criteria other than the minimization requirement serve the purpose of placing restrictions on the exercise of a zoning board's inherent power to exercise discretion in the granting of a variance. The [objector] offers no legal citation to cases in which zoning hearing boards or reviewing courts have applied the minimization requirement in the context of a pure use variance application. We acknowledge here that our own research may have failed to discover such a case, but, even so, absent such a reference in the [objector's] brief, we conclude that the minimization requirement is not relevant in this case. We conclude, therefore, that the [objector's] argument as to this issue lacks merit and does not provide support for the [objector's] claim that the ZBA erred in granting the variance.

Id. at 124. This rationale applies equally here. In its brief to this Court, Objector makes no attempt to distinguish South of South Street Neighborhood Ass'n nor does it acknowledge the above-quoted holding.

Further, the cases Objector cites for the proposition that a multi-unit residential developer must show that fewer units could not be built in order to obtain variance relief all involved either dimensional variance requests or situations in which the applicant did not prove the requisite unnecessary hardship. Therefore, those cases are inapposite here.

---

[14] Section 910.2(a) of the Pennsylvania Municipalities Planning Code was added by the Act of December 21, 1988, P.L. 1329.

In any event, the ZBA here determined: "Applicant presented evidence – including credible expert testimony – sufficient to establish that uses permitted under the existing zoning are not viable and that the requested variance is the least necessary to afford relief." Concl. of Law No. 13. As explained above, the record supports the ZBA's determination. Thus, to the extent the minimization requirement is present in this context, Applicant satisfied it. See In re Appeal of Redeemed Christian Church of God, Living Spring Miracle Ctr. (Pa. Cmwlth., No. 930 C.D. 2015, filed December 28, 2016), 2016 WL 7449224 (unreported).

## IV. Conclusion

For all the foregoing reasons, we affirm.

 

_____

ROBERT SIMPSON, Judge

Judges Cohn Jubelirer and Fizzano Cannon did not participate in the decision in this case.

49

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Liberties Lofts LLC,                :
                   Appellant        :

                            :        No. 827 C.D. 2017

          v.                :

                            :

Zoning Board of Adjustment          :

## **O R D E R**

**AND NOW**, this 2nd day of April, 2018, the order of the Court of Common Pleas of Philadelphia County is **AFFIRMED**.

 

_____
ROBERT SIMPSON, Judge