IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Appeal of Melissa V. Johanningsmeier | : | |
| | : | |
| | : | No. 200 C.D. 2023 |
| From Decision of City of Philadelphia | : | |
| Zoning Board of Adjustment and | : | |
| Warrington Development Partners, LP | : | Submitted: August 8, 2025 |
| | : | |
| Appeal of: Warrington Development | : | |
| Partners, LP | : | |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                    HONORABLE LORI A. DUMAS, Judge
                    HONORABLE MATTHEW S. WOLF, Judge

***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                                    FILED: September 23, 2025

Warrington Development Partners, LP (Developer) appeals from the January 30, 2023 order of the Court of Common Pleas of Philadelphia County (trial court), which granted the appeal of Appellee Melissa V. Johanningsmeier (Objector) and reversed the March 15, 2022 decision of the City of Philadelphia Zoning Board of Adjustment (ZBA). In its decision, the ZBA granted Developer three dimensional variances and a use variance in connection with Developer's proposed construction of a two-building, multi-family housing project on property located in the City of Philadelphia (City). In this Court, Developer argues that the trial court erred in reversing the ZBA's grant of the variances. Upon review, we affirm.

## I.    Facts and Procedural History

The material facts of this case largely are undisputed. We summarize them as follows based on the ZBA's findings and, where necessary, the facts of record.

Developer is the current owner of property located at 5000 Warrington Avenue in the City (Property). The Property is triangular in shape and composed of approximately 75,000 square feet. It is bounded by Warrington Avenue, 50th Street, Springfield Avenue, and an active railroad line and right-of-way. Pursuant to the City's Zoning Code (Zoning Code),[1] the Property is located in the City's Medium Industrial I-2 Zoning District (I-2 District), where multi-family dwellings are not permitted uses.[2] Zoning Code, Table 14-602-3. Although previously utilized as an automobile storage facility or junkyard, the Property now is occupied by several vacant buildings in a state of disrepair, abandoned vehicles, and overgrowth.

Adjacent to or in the immediate vicinity of the Property are parcels zoned as RM-1 (Residential Multi-Family-1), CMX-2 (Neighborhood Commercial Mixed-Use-2), RSA-3 (Residential Single-Family Attached-3), and RSA-5 (Residential Single-Family Attached-5). (Reproduced Record (R.R.) at 033a.) Most of those parcels are residential and contain single-family dwellings. Multi-family dwellings are permitted uses in the RM-1 and CMX-2 Districts, but are not permitted in the RSA-3 and RSA-5 Districts. (Zoning Code, Tables 14-602-1, 14-602-2.)

The Property's prior owner, Do 2 Win RE Group, LLC (Do 2 Win), through counsel, applied to the City's Department of Licenses and Inspections (L&I)

---

[1] City of Philadelphia, Pennsylvania, Zoning Code, *as amended* (2013), *available at* https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-286773 (last visited September 22, 2025).

[2] The City's industrial districts are "primarily intended to accommodate manufacturing, warehousing, and industrial uses." Zoning Code, § 14-403(1)(b). The I-2 District is "primarily intended to accommodate light industrial uses, moderate-impact uses, and employment activities such as manufacturing, distribution, processing, industrial parks, and other activities that may generate noise, odor, vibration, after hours activities, or traffic impacts well beyond the subject property lines." *Id.* § 15-403(1)(c)(.3).

to (1) consolidate the nine parcels composing the Property into a single, triangular-shaped parcel, and (2) erect thereon two multi-family residential buildings 72 feet and 60 feet in height, respectively, and together containing 100 affordable housing units. The buildings would be accompanied by 100 open-air parking spaces, two loading spaces, and 34 bicycle spaces (together, the Project). L&I issued a Notice of Refusal on July 20, 2021, on three grounds: (1) multi-family dwellings are prohibited in the I-2 District; (2) the proposed 5.1% interior landscaping fell below the 10% interior landscaping requirement, *see* Zoning Code, § 14-803(5)(e); and (3) the two proposed loading spaces were fewer than the required number of seven. *Id.*, Table 14-806-1.

Do 2 Win, by counsel, appealed to the ZBA, requesting the issuance of use and dimensional variances that would permit completion of the Project as proposed. While the appeal was pending, DO 2 Win conveyed the Property to Developer by deed dated December 3, 2021. (R.R. at 061a.) From that point, Developer prosecuted the appeal and submitted revised plans for the Project to the ZBA.[3]

On January 14, 2022, Objector's counsel sent a letter to both the ZBA and Developer's counsel challenging the adequacy of Developer's notice to the community, identifying additional grounds for refusal not cited by L&I, and requesting further review of the application. Objector's counsel contended that 1) the Project violated the Zoning Code's restrictions limiting building height to 60 feet for any I-2 District properties "abutting" a residential or SP-PO district,[4] *see* Zoning Code, Table 17-

---

[3] The revised plans, among other things, altered the proposed heights of both buildings, reduced their gross floor area and footprint, increased the number of dwelling units to 104, and reduced the number of parking spaces from 100 to 99. Throughout the record, the revised plans at times are referred to as the "proviso" plans. *See, e.g.*, Notes of Testimony (N.T.), 3/15/22, at 15; R.R. at 211a.

[4] "The SP-PO Parks and Open Space (Special Purpose) district is intended to help preserve and protect lands set aside for park and open space use." Zoning Code, § 14-407(1).

701(4); 2) the Project violated Section 14-701(4) of the Zoning Code, as it provided for a rear yard setback of 6.9 feet, which was less than the required eight feet; and 3) Developer's revised plans indicated a total of 104 dwelling units for the Property, which was four more than the 100 units originally proposed.

The ZBA conducted a virtual hearing on March 15, 2022. At the outset, counsel from the City's Law Department appeared to address the additional grounds for refusal identified in Objector's counsel's letter. The City's counsel indicated that, after further review, L&I determined that no additional refusals were warranted based on height restrictions or the changes made in the revised plans. He further explained, however, that the proposed 6.9-foot rear yard setback was less than the eight feet required by the Zoning Code and was an additional ground for refusal. (N.T., 3/15/22, at 3-4; R.R. at 199a-200a.) Counsel suggested, and the parties and ZBA agreed, that the rear yard setback shortage could be added to the issues before the ZBA without need of further amendment to L&I's Notice of Refusal.

Developer's counsel presented Developer's evidence. Developer's counsel introduced photographs displaying the Property's blighted condition, areas overgrown with grass and brush, and multiple abandoned buildings and vehicles. He also introduced exhibits showing the triangular shape of the Property and the surrounding area, which contains primarily residential uses, and a zoning map of the area showing the adjoining or nearby zoning districts.

Developer's counsel next introduced site plans and renderings and explained that the Project would contain 104 one-, two-, and three-bedroom affordable housing units constructed under the Low Income Housing Tax Credit or similar program. The Project would include 99 accessory parking spaces, 34 bicycle parking spaces, and a public community park. Counsel described the multiple meetings that

4

Developer had with various community groups and organizations and indicated that the majority of those groups contributed to and agreed with the revised site plans for the Project. He highlighted the fact that multiple Registered Community Organizations (RCO)[5] were involved in developing the revised site plans and that the City's Civic Design Review (CDR) Committee reviewed the plans and provided input and recommendations.[6] Developer's project manager, Polina Bakhteiarov, adopted counsel's presentation as her own without further comment.

In response, Objector's counsel presented Objector's case. Objector's counsel contended that Developer had not satisfied the Zoning Code's criteria for the issuance of either a use variance or dimensional variances. In particular, counsel pointed out that Developer had not presented any evidence establishing the hardship required for a variance, namely, that there are unique characteristics of the Property that prohibit it from being developed in strict conformity with the Zoning Code. Counsel further explained that the Property recently had been utilized for one of the uses permitted in the I-2 District and that an adjacent Property is being used as a car storage and repair shop, which is permitted in the I-2 District. Objector's counsel acknowledged the Property's blighted state, but nevertheless contended that Developer had not established how that precluded compliance with the provisions of the Zoning Code. In support, counsel introduced Table 14-602-3 from the Zoning Code, which sets forth the permitted uses in the I-2 District. Those uses include, *inter alia*, passive recreation, safety services, transit stations, utilities and related services, wireless

---

[5] Pursuant to Section 14-303(8)(d) of the Zoning Code, after a variance application is submitted to the ZBA, notice of the application must be provided to RCOs in accordance with Section 13-303(12). *See* Zoning Code, § 14-303(8)(d), (12).

[6] Developer's counsel admitted into evidence letters in support of the Project from two RCOs and Cedar Park Neighbors and the written review summary and recommendations of the CDR Committee. (R.R. at 027a-031a.)

services, group medical offices, business and professional offices, government offices, building supplies and equipment dealers, banks, animal services, vehicle repair and maintenance, fuel stations, storage and warehousing facilities, artist studios, community gardens, and market or community-supported farms.

Objector's counsel further insisted that Developer failed to establish any of the other criteria for a use variance, namely, that this particular use variance was the minimum variance needed to afford relief, that the Project would not alter the character of the neighborhood, increase congestion, or otherwise endanger public health, safety, or general welfare, or that the Project would not substantially or permanently injure the appropriate use of adjacent, conforming properties. With regard to the character of the surrounding neighborhood, counsel noted that the surrounding properties are mostly one- and two-story residences located in residential districts and that two multi-story, multi-family buildings of the size proposed in the Project would be out of place. Regarding the minimum variance necessary, counsel argued that Developer had not presented any evidence at all on this factor, noting that, notwithstanding that the Property might be blighted and not aesthetically pleasing, Developer had not shown that its use variance request was the minimum necessary. Regarding injury to the public health and/or neighboring properties, counsel noted that two buildings containing 104 residences would substantially increase congestion on the public streets surrounding the Property, which are lined primarily with single-family, two-story residences. Objector agreed with her counsel's presentation and adopted it as her own.

In rebuttal, Developer's counsel stated that the isolated nature of the Property's zoning classification and the fact that it is surrounded by disharmonious residential and transit uses create a hardship that satisfies the requirements for a use variance. He further noted that the revised plans had been reviewed by the City's

streets department and the CDR Committee with regard to traffic, loading requirements, mitigation efforts, and street design. Objector's counsel introduced no further evidence.

The ZBA then heard testimony from community members, RCO representatives, a representative from the local City councilperson's office, and the City Planning Commission.[7] Christopher Mejia-Smith, a community member who attended several of the community planning meetings regarding the Project, testified in support of granting the requested variances particularly given that affordable housing is a major priority for the City. He further testified that he believed the Property's zoning was outdated and the result of a "drafting error."[8] Diane Settles, a representative of RCO Kingsessing Area Civic Association, testified that she did not support the Project because she did not have the opportunity to review the revised plans and because she did not believe the community had adequately been involved in the plan discussion meetings. Mark Herrell, the Co-Chair of the 51st Ward RCO and a longtime member of the local community, supported Developer's application because it provided an opportunity to construct affordable housing and obliterate the blight of an eyesore in the community.

Next, Alex Schieferdecker, another community resident who attended several public meetings regarding the Project, opposed the grant of the dimensional

---

[7] Pursuant to Section 14-303(8)(c) of the Zoning Code, variance applications must be reviewed by the City Planning Commission, which must make a recommendation to the ZBA.

[8] Mr. Mejia-Smith testified:

> I believe what we have here is simply outdated zoning and a drafting error. If you look at the University Southwest District plan for this lot, it is circled and denoted [ ] that the zoning should be I-2 as aligning to the existing land use. [T]his land has not been used in an industrial form for many years. So I believe that was a drafting error.

(N.T., 3/15/22, at 31-32; R.R. at 227a-28a.)

7

variances because he believed there was ample room on the Property to comply with the Zoning Code's design requirements.[9] Mr. Schieferdecker nevertheless supported the grant of the use variance, noting that an industrial use of the Property in the future was incongruent with the surrounding neighborhood.[10]

Andrew Goodman, a representative of Councilmember Jamie Gauthier's office, testified that Councilmember Gauthier fully supported the Project because a by-right industrial use on the Property would have long term impacts on the neighborhood quality of life and because publicly controlled affordable housing in this neighborhood was necessary.

Lastly, Ian Hegarty, a representative of the City Planning Commission, testified that the City's Comprehensive Plan zoning recommendation was to change the Property's classification from I-2 to ICMX[11] to prevent heavy industrial uses adjacent to residential uses. He further noted that the proposed residential use on the Property would align with the City's plan to provide wide-ranging housing types across

---

[9] Specifically, Mr. Schieferdecker testified that "[Developer] has simply chosen not to comply with site design requirements basically from the start, because [it has] chosen instead to prioritize a massive surface parking lot over anything else, even additional affordable housing, and the ZBA does not need to endorse that choice." (N.T., 3/15/2022, at 36; R.R. at 232a.)

[10] In this respect, Mr. Schieferdecker complained that "it[ is] embarrassing that past and present [C]ouncil members have not rezoned the site correctly." (N.T., 3/15/2022, at 36-37; R.R. at 233a-34a.) He further noted that, historically, the Property was utilized first as a coal yard and most recently as a junk yard, neither of which were "suitable or practical" at present. *Id.* at 37; R.R. at 233a.

[11] The ICMX zoning district is the Industrial Commercial Mixed-Use district, which "is primarily intended to accommodate commercial and low-impact industrial uses. The district may serve as a buffer between Industrial districts and Commercial and Residential Districts." Zoning Code, § 14-403(1)(c)(.2). Multi-family dwellings are not permitted in the ICMX district. Zoning Code, Table 14-602-3.

the City, and therefore the Planning Commission supported the issuance of a use variance.

At the conclusion of the hearing, the ZBA members voted 3-1[12] in favor of granting both the use and dimensional variances with the attached provisos that (1) the Project be developed consistently with the revised plans, (2) the Project contain a maximum total number of 104 units, and (3) that a variance for the rear yard setback, if necessary, was granted. (R.R. at 273a.)

The ZBA issued supporting findings of fact and conclusions of law on September 12, 2022. Therein, the ZBA cited the pertinent Zoning Code requirements for both use and dimensional variances. With regard to the use variance, and the unnecessary hardship requirement in particular, the ZBA concluded as follows:

> 15.  The Property is an extremely large, triangular-shaped parcel that is bordered, on one side, by the West Chester and Philadelphia Railroad. The Property is vacant and unused. Structures at the site are in a derelict condition and portions of the lot not occupied by structures are overgrown with weeds and appear to serve as a dumping ground for abandoned vehicles. In its current state, the site may properly be described as a blight on the neighborhood.
>
> 16.  The Property's I-2 classification is, moreover, completely incompatible with the surrounding residential uses and zoning. The record clearly provides substantial, credible evidence that the residential character of the neighborhood renders the subject [P]roperty virtually unusable and of scant value for I-2 purposes.
>
> 17. The [ZBA] concludes these circumstances are sufficient to establish the hardship required for [granting] the requested variances, including the variance for multi-family residential use.

---

[12] One ZBA member, Ismail Shahid, voted to deny the requested variances.

9

18. In reaching this conclusion, the [ZBA] rejects [Objector's counsel's] contentions that an applicant must show the [P]roperty cannot be used for any permitted purpose, that a property's blighted condition is not relevant to a determination of hardship, and that the subject Property—a 75,000[-]square-foot, triangular shaped parcel that borders railroad tracks on one side—has no unique physical conditions that would support the grant of a variance. These contentions are clearly inconsistent with the caselaw discussed above.

(ZBA Conclusions of Law (COL) 15-18; R.R. at 267a-68a) (quotations omitted).

The ZBA further concluded that the requested variances are the minimum necessary to afford relief and that granting them would not alter the essential character of the surrounding neighborhood. (COL 20, 21.) With regard to the latter finding, the ZBA found that the I-2 District was inconsistent with the surrounding uses and that "[i]nstituting a new, industrial use at the Property, in addition to not being feasible, would alter the essential character of the surrounding neighborhood far more than the proposed residential use." (COL 21(a), (b).) The ZBA further determined that (1) granting the use variance would not increase congestion or otherwise endanger the public health, safety, or general welfare, (2) would not injure the appropriate use of adjacent properties, and (3) would not adversely and substantially affect the implementation of any adopted plan for the area. (COL 22-24.)

As to the dimensional variances, the ZBA (1) concluded that the rear yard setback violation was *de minimis* and granted a variance accordingly, (2) concluded that the revised plans did not violate the height limitations imposed by the Zoning Code because the Property does not "abut" a residential zoning district, and (3) concluded that the changes in the revised plans did not require further review. (COL 25-30.)

Objector appealed to the trial court, which did not conduct a hearing or receive additional evidence. The trial court issued its order and accompanying opinion

on January 30, 2023, in which it granted Objector's appeal and reversed the ZBA. The trial court chiefly concluded that Developer had failed to support any of its requested variances with evidence either that the Property as zoned posed a substantial hardship or that the requested variances were those minimally necessary to afford relief. (Trial Ct. Order and Memorandum Opinion (Trial Ct. Op.), 1/30/23, at 2, 17-20.)

Developer now appeals to this Court.

## II.    Issues

Developer presents a single issue for our review, which for purposes of analysis is better divided into two. Developer contends that the trial court erred in reversing the ZBA because its decision granting both the use variance and the dimensional variances was supported by substantial evidence in the record.[13] Objector argues in response that the trial court correctly concluded that Developer did not present substantial evidence supporting either the use or dimensional variances.

## III.    Discussion

### A.    Standard of Review

We recently summarized this Court's standard of review in appeals from trial court decisions reviewing the actions of a zoning hearing board:

> Where the trial court does not take any additional evidence, appellate review of the decision of a zoning hearing board is limited to determining whether the board abused its discretion or erred as a matter of law. A zoning hearing board abuses its discretion where its findings are not supported by substantial evidence, which is such relevant evidence that a reasonable mind would accept as adequate to support the conclusions reached. We may not substitute our

---

[13] Although the City Planning Commission participated in the hearing before the ZBA, it did not file an appellate brief in this Court. We precluded the City from filing a brief by order exited April 9, 2024.

11

interpretation of the evidence for that of the zoning hearing board, which has expertise in, and knowledge of, local conditions. Even if we might come to a different conclusion, if the zoning hearing board's determination is supported by substantial evidence, we will not disturb it.

Further, a zoning hearing board's function is to weigh evidence, and it is the sole judge of the credibility and weight of the witnesses' testimony. A zoning hearing board is free to reject even uncontroverted testimony it finds lacking in credibility, including testimony offered by an expert witness. We must view the evidence in a light most favorable to the party that prevailed before the zoning hearing board and afford that party all inferences reasonably drawn from the evidence. Finally, because we review the zoning hearing board's decision, we do not address arguments challenging the trial court's decision.

*RDM Group v. Pittston Township Zoning Hearing Board*, 311 A.3d 1216, 1223-24 (Pa. Cmwlth. 2024) (internal citations and quotations omitted). *See also* Section 1005-A of the Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 11005-A ("If the record below includes findings of fact made by the [ZBA] and the court does not take additional evidence or appoint a referee to take additional evidence, the findings of the [ZBA] shall not be disturbed by the court if supported by substantial evidence.").

### B.  Variance Standards

For variances of any kind, the Zoning Code requires that an applicant satisfy all of the following criteria:

(.a) The denial of the variance would result in an unnecessary hardship. The applicant shall demonstrate that the unnecessary hardship was not created by the applicant and that the criteria set forth in [Section] 14-303(8)(e)(.2) (Use Variances) below, in the case of use variances, or the criteria set forth in [Section] 14-303(8)(e)(.3) (Dimensional Variances) below, in the case of dimensional variances, have been satisfied;

12

(.b)   The variance, whether use or dimensional, if authorized will represent the minimum variance that will afford relief and will represent the least modification possible of the use or dimensional regulation in issue;

(.c)   The grant of the variance will be in harmony with the purpose and spirit of this [ ] Code;

(.d)   The grant of the variance will not substantially increase congestion in the public streets, increase the danger of fire, or otherwise endanger the public health, safety, or general welfare;

(.e)   The variance will not substantially or permanently injure the appropriate use of adjacent conforming property or impair an adequate supply of light and air to adjacent conforming property;

(.f)   The grant of the variance will not adversely affect transportation or unduly burden water, sewer, school, park, or other public facilities;

(.g)   The grant of the variance will not adversely and substantially affect the implementation of any adopted plan for the area where the property is located; and

(.h)   The grant of the variance will not create any significant environmental damage, pollution, erosion, or siltation, and will not significantly increase the danger of flooding either during or after construction, and the applicant will take measures to minimize environmental damage during any construction.

(Zoning Code, § 14-303(8)(e)(.1)(.a)-(.h)).  With regard to use variances in particular, the applicant must satisfy the following additional criteria:

(.2)   **Use Variances.**

To find an unnecessary hardship in the case of a use variance, the [ZBA] must make all of the following findings:

(.a)  That there are unique physical circumstances or conditions (such as irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions) peculiar to the property, and that the unnecessary hardship is due to such conditions and not to circumstances or conditions generally created by the

13

provisions of this Zoning Code in the area or zoning district where the property is located;

(.b) That because of those physical circumstances or conditions, there is no possibility that the property can be used in strict conformity with the provisions of this Zoning Code and that the authorization of a variance is therefore necessary to enable the viable economic use of the property;

(.c) That the use variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and

(.d) That the hardship cannot be cured by the grant of a dimensional variance.

*Id.* § 14-303(8)(e)(.2)(.a)-(.d.).[14] The burden to establish all of the variance criteria is on the applicant, and the burden is a heavy one. *Liberties Lofts LLC v. Zoning Board of Adjustment*, 182 A.3d 513, 530 (Pa. Cmwlth. 2018). Variances should be granted sparingly, only upon a showing of exceptional circumstances, and only for "substantial, serious, and compelling" reasons. *Singer v. Philadelphia Zoning Board of Adjustment*, 29 A.3d 144, 148 (Pa. Cmwlth. 2011); *Pham v. Upper Merion Township Zoning Hearing Board*, 113 A.3d 879, 891 (Pa. Cmwlth. 2015).

As to use variances, the unnecessary hardship requirement may be satisfied by evidence establishing that (1) the physical features of the property preclude its use for a permitted purpose; (2) a permitted use can be accomplished only at prohibited expense; and/or (3) the property does not have value for any permitted use. *Marshall v. City of Philadelphia*, 97 A.3d 323, 330 (Pa. 2014). In evaluating whether

---

[14] Section 14-303(8)(e)(.1), (.2) contains all of the variance prerequisites set forth in Section 910.2(a) of the MPC, added by the Act of December 21, 1988, P.L. 170, 43 P.S. 10910.2(a). We accordingly cite to and discuss below cases interpreting both the MPC's variance requirements and those in the Zoning Code. *See Marshall v. City of Philadelphia*, 97 A.3d 323, 329 n.9 (Pa. 2014).

14

an unnecessary hardship exists, the use and character of surrounding properties is relevant, *Valley View Civic Association v. Zoning Board of Adjustment*, 462 A.2d 637, 640 (Pa. 1983), as is the blighted, abandoned, or dilapidated nature of the property. *Marshall*, 97 A.3d at 332-33; *Metal Green, Inc. v. City of Philadelphia*, 266 A.3d 496, 511 (Pa. 2021) (plurality). A property owner is not required to show that a property is valueless or functionally obsolete as zoned. *Marshall*, 97 A.3d at 330, 331. Although economic hardship is relevant to the variance analysis, economic hardship alone will not suffice to support the issuance of a use variance, and the fact that an applicant's proposed use of a property is more profitable than a permitted use likewise is insufficient. *Id*; *Pham,* 113 A.3d at 892; *Society Created to Reduce Urban Blight (SCRUB) v. Zoning Board of Adjustment of Philadelphia*, 814 A.2d 847, 850 (Pa. Cmwlth. 2003).

## C.    Analysis

Because the issue is dispositive of this appeal, we address first and only whether the ZBA erred or abused its discretion in granting Developer a use variance. The parties' dispute in this respect centers on whether Developer established an unnecessary hardship. In other words, the parties dispute whether a hardship caused by the Property's peculiar physical characteristics (and not by Developer itself or the general Zoning Code requirements for the I-2 District) imposes an unnecessary hardship on the use and development of the Property as zoned. In finding substantial hardship, the ZBA relied exclusively on the Property's size, shape and blighted condition together with the character and zoning of surrounding properties.

In *Valley View Civic Association*, a property owner applied to the ZBA for variances to convert her recently purchased property, zoned in a single-family residential district, into a take-out steak and sandwich shop and a two-story family

15

dwelling. 462 A.2d at 639. The property was situated between a convenience store and a gas station, and a bank and tire store were located across the street. *Id.* at 641. The building on the property had housed a nursery business with two apartments on the second floor prior to the owner's purchase. *Id.* Various other commercial uses surrounded the property in the immediate vicinity. *Id.* The ZBA granted the variances, finding that the property owner established the existence of an unnecessary hardship "by showing that the subject property is virtually surrounded by dissimilar and disharmonious commercial and industrial uses which render it virtually impossible to use the site for residential purposes." *Id.* The trial court affirmed, and this Court reversed. The Pennsylvania Supreme Court reversed and reinstated the trial court's order, concluding as follows:

> We are satisfied that the [ZBA] could reasonably have inferred from the evidence before it that the extensive commercial and industrial uses in the immediate vicinity rendered [the owner's] property virtually unusable and of scant value for traditional residential purposes. That evidence paints a picture of a property flanked by a large convenience store and a gas station on a heavily traveled roadway, surrounded by a patchwork of commercial and industrial businesses, vacant lots and intermittent dwellings. It would not be unreasonable to infer that a property so situated would be undesirable and hence unmarketable for residential use.

*Id.* at 642.

More recently, in *Marshall*, the Archdiocese of Philadelphia sought to convert a closed, dilapidated, legally nonconforming elementary school into a 63-unit apartment complex for low-income seniors, which also was not a permitted use in the property's R-10A Residential Zoning District. The Archdiocese applied for use and dimensional variances and presented evidence establishing the school's poor condition,

16

its legally nonconforming status, and that it could be rehabilitated for a permitted use only at prohibitive cost. 97 A.3d at 326-27, 332. The ZBA granted the variances, finding that the proposed use would better serve the public interest and place fewer burdens on the neighborhood compared to its previous use as a school. The ZBA found that the subject-property's unique conditions related to its "legally non-conforming character" justified the grant of a use variance. *Id.* at 327-28. The ZBA was also swayed by the project's overwhelming support from the community, the "unique nature" of the Department of Housing and Urban Development's approval of the project, and the Archdiocese's longstanding commitment to the property. *Id.* at 333. The court of common pleas affirmed the ZBA's decision.

This Court reversed on appeal, finding the Archdiocese had not shown unnecessary hardship or demonstrated that the building was "functionally obsolete" for any other permitted use. *Id.* at 328. The Supreme Court reversed, holding that this Court applied too strict a standard of review in requiring the Archdiocese to establish that the property was "valueless" or "functionally obsolete" for a permitted use. *Id.* at 329-32. The Court, relying on its decision in *O'Neill v. Philadelphia Zoning Board of Adjustment*, 120 A.2d 901 (Pa. 1956), reaffirmed that the ZBA's discretion "is not so circumscribed as to require a property owner to reconstruct a building to a conforming use regardless of the financial burden that would be incident thereto, especially where the change sought is from one nonconforming use to another more desirable nonconforming use that will not adversely affect but better the neighborhood." *Marshall*, 97 A.3d at 333 (internal editing omitted). It accordingly determined that the ZBA had acted within its discretion to grant a use variance permitting the property to be converted to provide low-income senior housing. *Id.*

17

Here, we agree with the trial court that, even affording due deference to the ZBA as the factfinder and viewing its findings in the light most favorable to Developer, we cannot conclude that Developer established an unnecessary hardship with substantial evidence.

First, regarding the Property's triangular shape, purportedly large size, and blighted and vacant condition, the record does not indicate how those conditions create any hardship here, let alone an unnecessary one. As to the Property's triangular shape, assuming that it was not of Developer's own creation by its proposed consolidation of nine adjoining parcels into one,[15] there is nothing in the record indicating why such a shape is "irregular," particularly given that at least four other properties in the immediate vicinity also are triangular. *See* R.R. at 033a. There is further no evidence in the record establishing why such a shape creates an unnecessary hardship on development of the Property for a permitted use. We likewise do not see how the Propety's size, which is not markedly larger than many of the surrounding properties, renders it difficult to develop consistently with the Zoning Code.

Second, as to the Property's undisputedly blighted condition, Developer failed to present any evidence as to *why* the Property's blighted condition creates a substantial hardship on its development in accordance with the Zoning Code. The costs of rehabilitation to strictly conform with the Zoning Code or to renovate blighted buildings undoubtedly is relevant to the issue of unnecessary hardship. *Marshall*; *Metal Green*, 266 A.3d at 510. Such costs are not compelling, however, where, as here, rehabilitation of the Property would be necessary for *any* use, permitted or not.

---

[15] Although the trial court concluded that Developer's proposed consolidation created any hardship imposed by the Property's triangular shape, *see* Trial Ct. Op. at 18, there is evidence in the record suggesting that the several parcels composing the Property historically have been developed together in a triangular pattern. *See, e.g.*, R.R. at 141a, 178a. The City's zoning map also zones the parcels together under a single I-2 District designation. R.R. at 101a.

18

Unlike the circumstances in *Marshall*, for example, where the developer presented evidence that rehabilitation of the non-conforming school would be cost-prohibitive, Developer here presented no evidence at all as to rehabilitation costs and did not contend that rehabilitation of the Property for a permitted use would be cost prohibitive or more expensive than that required for the Project. *See Also In re: 3401 Properties, LLC*, 318 A.3d 152, 159-60 (Pa. Cmwlth. 2024) (ZBA erred in denying use variance application to develop property with renovated multi-family residential buildings where the subject property previously housed multi-family dwelling units for over 50 years, the buildings had fallen into disrepair and were attracting squatters, drug use, and other problems, surrounding properties consisted mostly of multi-unit properties, and development of buildings into single-family homes was financially unfeasible).

Third, the ZBA's conclusions that "the Property's I-2 classification is . . . completely incompatible with the surrounding residential uses and zoning" and that the "record clearly provides substantial, credible evidence that the residential character of the neighborhood renders the subject property 'virtually unusable and of scant value' for I-2 purposes," (COL 16), is not supported by substantial evidence in the record or the pertinent provisions of the Zoning Code. The properties adjacent to and in the immediate vicinity of the Property are zoned in the RSA-3, RSA-5, RM-1, and CMX-2 zoning districts. Of those districts, multi-family dwellings like those proposed in the Project are permitted only in the CMX-2 and RM-1 districts. *See* Zoning Code, Tables 14-602-1, 14-602-2. Multi-family dwellings are not permitted in either the RSA-5 or RSA-3 districts. *Id.*, Table 14-602-1. The ZBA performed no actual analysis of the zoning districts nearby and assumed that the preclusion of multi-family dwellings was entirely unique to the Property and inconsistent with the character of the neighborhood. That assumption is unsupported here. *Compare RDM Group*, 311 A.3d at 1227 (zoning

19

hearing board erred in failing to find unnecessary hardship where developer presented expert testimony and other evidence establishing that triangular-shaped, vacant property zoned as residential was "shoehorned" on two sides by industrial uses and that township had re-zoned one of the adjacent properties for industrial use to permit the construction of a distribution facility); *Taliaferro v. Darby Township Zoning Hearing Board*, 873 A.2d 807, 812-13 (Pa. Cmwlth. 2005) (zoning hearing board properly granted a use variance for the construction of a self-storage facility on a property zoned residential where landowner presented evidence that the property had remained idle for over 50 years, that attempts to develop the property as residential were never implemented, that the area surrounding the property primarily was commercial, and that development as a residence would be impractical and cost prohibitive).

Importantly, the ZBA's findings and conclusions assume that the only uses permitted or practicable in the I-2 District are heavy industrial uses with their attendant noise, air pollution, machinery, and traffic disruption. This again is not supported by either the record or the Zoning Code. "Intensive industrial" uses are not permitted in the I-2 District, and many other uses are permitted that are consistent with, or even beneficial to, the neighborhood surrounding the Property. *See* Zoning Code, Table 14-602-3 (I-2 District permitted uses include passive recreation areas,[16] business and professional offices, medical offices, government offices, animal services, banks, auto repair shops, parking facilities, service stations, and community gardens). Developer presented no evidence at all, and the ZBA performed no analysis, as to whether the Property could reasonably or economically be developed for any of these permitted uses.

---

[16] Passive recreation areas are "[r]ecreational facilities associated with pastimes that are incidental to natural open space. These facilities require minor land development, require minimal maintenance, and have little impact on natural open space." Zoning Code, § 14-601(3)(b).

20

This case is distinguishable from several of our recent cases wherein we have found substantial evidence of unnecessary hardship. For example, in *Liberties Lofts*, we affirmed the ZBA's grant of a use variance permitting the construction of a 26-unit multi-family residence on a blighted and vacant property within the City's ICMX District, which does not permit multi-family dwellings. 182 A.3d at 515. The owner further presented the testimony of its project manager, architect, corporate representative, and a real estate broker, who together testified to the compatibility of the proposed use with several nearby multi-family dwellings, the property's vacant and abandoned commercial uses, the unfeasibility of developing the property for permitted retail or industrial uses, and the negligible value of the property for uses permitted in the ICMX district. *Id.* at 516-17. The ZBA found that the property had negligible viability for any permitted uses given its present condition, the changed character of the surrounding neighborhood, and the prohibitive expense that would be involved in rehabilitation for a permitted use. *Id.* We found the ZBA's findings to be amply supported by substantial evidence. *Id.* at 535, 539.

Similarly, in *In re: Bass*, 320 A.3d 892 (Pa. Cmwlth. 2024), we affirmed the ZBA's grant of a use variance to the owner of a vacant and blighted property within the City's CA-1 Auto-Oriented Commercial District.[17] The property formerly was used as an auto repair shop, but was abandoned and in need of significant environmental remediation. The owner proposed to construct a 37-unit multi-family residence, which use is not permitted in the CA-1 district. *See* Zoning Code, Table 14-602-2. In support, the owner's counsel provided a background explanation of the

---

[17] The CA-1 District is intended to accommodate "shopping centers and other destination-oriented uses in which a large percentage of customers will arrive by automobile." Zoning Code, § 14-402(1)(c)(.7).

21

project and presented the testimony of the project engineer/architect and a real estate developer, who together testified to the physical condition of the property, the impediments to using it for a permitted use, and market data showing the infeasibility of development for commercial uses. *Id.* at 894-96. The owner also introduced a copy of the City Planning Commission's 2035[18] Plan, which proposed a revision to the property's zoning to authorize multi-family dwellings by right. *Id.* at 896.[19] Relying in part on our decision in *Liberties Lofts*, we found such evidence to be sufficient to establish unnecessary hardship.

Lastly, in our unreported and nonprecedential decision in *Chosen 300 Ministries, Inc. v. City of Philadelphia Zoning Board of Adjustment* (Pa. Cmwlth., No. 67 C.D. 2015, filed January 19, 2016), upon which both the ZBA and Developer have relied, we affirmed the grant of use and dimensional variances to develop a vacant lot in the City's I-2 District with a multi-unit apartment building. The applicant presented evidence that the property was irregular (not triangular) in shape and that the surrounding area had changed from industrial to more mixed residential and commercial uses, having been "abandoned by former industry and manufacturing." *Id.*, slip op. at 2-3. A representative from a local RCO also testified that the proposed use was consistent with the recent trend toward developing the area into a residential community, which would improve the quality of life in the neighborhood. *Id.* The

---

[18] The 2035 Plan is publicly available at https://www.phila2035.org/plan (last visited September 22, 2025).

[19] The Comprehensive Plan "serves as the statement of goals, recommendations, and policies guiding the development of the physical environment of the City." Zoning Code, § 14-105(1). *See also id.* § 14-105(3) ("Where a Comprehensive Plan or an amendment to the Comprehensive Plan has been adopted pursuant to [Section] 14-304(2) (Comprehensive and Other Plan Adoption), the recommendations of that [P]lan shall be considered by the Commission and [ZBA] as a factor in making any decision on a zoning permit application on a topic or area covered by the adopted plan.")

ZBA found this evidence sufficient to establish unnecessary hardship, and we agreed. Quoting our decision in *South of South Street Neighborhood Association v. Philadelphia Zoning Board of Adjustment*, 54 A.3d 115, 120 (Pa. Cmwlth. 2012), we concluded that, although "a property may once have not been burdened by an unnecessary hardship, the course of time may effect changes to that property and the surrounding area [that] may ultimately result in the creation of an unnecessary hardship that did not previously exist." *Chosen 300 Ministries, Inc.*, slip op. at 9.

The circumstances here are distinguishable from those in *Liberties Lofts, In re Bass*, and *Chosen 300 Ministries, Inc.* We already have noted that the evidence of record does not establish that the triangular shape of the Property is "irregular" or that the Property's size is prohibitive of development consistent with the Zoning Code. Further, there is no evidence in the record that the changing nature of surrounding properties and their uses has taken a once-compatible property and rendered it incompatible with the surrounding neighborhood's character. Instead, the evidence of record indicates that the Property was zoned in the I-2 District specifically to accommodate the now-ceased use of the Property as a warehouse and storage facility. (N.T., 3/15/22, at 31-32; R.R. at 227a-28a.) There further is no evidence that the surrounding neighborhood has ever changed from containing predominantly single-family dwellings.

Nor did Developer present any evidence, lay or expert, of any economic hardship it would suffer in developing the Property in accordance with the Zoning Code. Unlike the owners in *Liberties Lofts* and *In re Bass*, Developer presented no financial analysis, market data, or other evidence tending to show that development for a permitted use would be financially unviable, cost prohibitive, or even difficult.

23

Although such evidence is not required in every case, its absence here is determinative given the dearth of other evidence of hardship in the record.

Finally, we hasten to acknowledge that RCOs, other community representatives, and the City Planning Commission[20] support the Project, *see Liberties Lofts, LLC*, 182 A.3d at 535, and we are not unsympathetic to Developer's argument that the Project would benefit the surrounding community. Nevertheless, such support unaccompanied by other record evidence of unnecessary hardship cannot, in this instance, sustain the issuance of a use variance.[21]

## IV.    Conclusion

Because we conclude that Developer did not establish with substantial evidence an unnecessary hardship supporting the grant of a use variance, we affirm the trial court's order reversing the ZBA's decision. Given our disposition, we need not address Developer's remaining arguments.

_____
PATRICIA A. McCULLOUGH, Judge

---

[20] Also in contrast to *In re Bass*, here the City Planning Commission's representative indicated that the Commission's Comprehensive Plan recommends rezoning the Property to the ICMX District, where multi-family dwellings **are not permitted**. (N.T., 3/15/2022, at 44-45; R.R. at 240a-41a; Zoning Code, Table 14-602-3.) Instead, the Comprehensive Plan proposes that the several parcels making up the Property house mixed industrial, commercial consumer, medium-density residential, and transportation uses. *See* University Southwest District Plan, pp. 68-71, *available at* https://www.phila2035.org/university-southwest (last visited September 22, 2025). The Planning Commission nevertheless recommended the granting of the requested variances. (ZBA Finding of Fact 54; Conclusion of Law 24.)

[21] Our decision does not leave Developer or the community without recourse. As noted by nearby resident Alex Schieferdecker, rezoning the Property to a district where multi-family dwellings are permitted by right is still an available (and probably the appropriate) remedy. (N.T., 3/15/2022, at 31-32; R.R. at 227a-28a.)

24

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Appeal of Melissa V.      :
Johanningsmeier                  :
                             :    No. 200 C.D. 2023

From Decision of City of Philadelphia    :
Zoning Board of Adjustment and       :
Warrington Development Partners, LP    :
                             :
Appeal of: Warrington Development    :
Partners, LP                       :

## ***ORDER***

AND NOW, this 23rd day of September, 2025, the January 30, 2023 order of the Court of Common Pleas of Philadelphia County is AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge